F I L E D
United States Court of Appeals
December 19, 1997

DEC 19 1996

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

JOAN MAY, WILLIAM FELICELLI,          )
JOHN RIELLY, PETER CHADMAN,           )
VIRGINIA OGLESBY, and DAVID           )
HOLUBETZ, on behalf of themselves     )
and all others similarly             )
situated,                            )
                                      )
        Plaintiffs-Appellants,        )     No. 96-1504
                                      )
vs.                                   )
                                      )
TOWN OF MOUNTAIN VILLAGE,             )
DARRELL HUSCHKE, Mayor et al.,        )
                                      )
        Defendants-Appellees,         )

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 96-D-126)

_____

Submitted on the briefs:

John H. Steel, Telluride, Colorado, for Plaintiffs/Appellants.

Michael T. Gilbert, Robert E. Youle, Williams, Youle & Koenigs,
P.C., Denver CO, and J. David Reed, J. David Reed, P.C., Montrose,
Colorado, for Defendants.

_____

Before BALDOCK, BRORBY, Circuit Judges, and BROWN, Senior District
Judge.*
_____

BROWN, Senior District Judge.

        In this civil rights case the plaintiffs, all residents of the

Town of Mountain Village, Colorado, initiated a class action

against the Town and its governing officers to contest

_____

* Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

provisions of the Town Charter which allow nonresident landowners to vote in municipal elections. Upon cross motions for summary judgment, the District Court found that the provision allowing nonresidents to vote was not irrational or arbitrary, and thus did not violate plaintiff residents' constitutional right to equal protection under the law. Summary judgment was granted in favor of defendants on all federal law claims, and this appeal follows. May v. Town of Mountain Village, 944 F. Supp. 821 (D.Colo. 1996)

Jurisdiction of the Court of Appeals rests on 28 U.S.C. §1291 as an appeal from a final judgment of the District Court granting the defendants' motion for summary judgment, and dismissing plaintiff's complaint.

For the reasons set out below, we affirm that judgment.

## The Issues

In the District Court, plaintiffs based their claim of the unconstitutionality of the Charter upon five arguments – that is i) that the Equal Protection Clause bars nonresident landowner voting; ii) that basing town council districts partly on the number of nonresident landowners violates equal protection; iii) that voting by nonresident landowners violates Colorado law; iv) that Colorado law requires residency as a condition for participation in municipal charter elections; and v) that nonresident landowner voting and charter provisions on initiative and referendums violates Colorado's constitutional right of initiative and

2

referendum.  The District Court ruled only upon the first issue, finding that questions involving districting and various amendments to the Charter were moot or not ripe for judgment. The Court also declined to exercise supplemental jurisdiction over state law claims and those issues are not before us.[1]

The only question presented in this appeal is whether the home rule charter of the Town of Mountain View, which permits nonresident real property owners to vote in municipal elections, violates the 14th Amendment to the federal constitution by diluting the vote of the residents of that Town.

### The Facts

The pertinent undisputed facts in this case, as presented to the District Court, are as follows: (Joint Stipulated Plan and Schedule for Discovery, Pp. 87, 90-94, Appellants' Appendix).

The Town of Mountain Village is located in San Miguel County in the San Juan Range of the Rocky Mountains in southwest Colorado. As of July 1993, San Miguel County had approximately 4,300 permanent residents.  The Town, which consists of about 2,049 acres of land, is situated in the mountains above and on the opposite side of a ski mountain from the Town of Telluride, Colorado.  As of

---

[1]  At the time of the court's decision the Town was awaiting the results of an election to be held to determine whether districts would be redrawn, or whether districting should be abolished entirely in favor of at-large voting.  In addition it appeared that the amendment of the Charter relating to reduction of residence requirements from 180 days to 30 day had become moot, since plaintiffs did not challenge the 30 day requirement.

July, 1993, the Town of Telluride had a permanent population of approximately 1,360.

In 1984, the Telluride Company began development of the area that was later incorporated as the Town under a development plan first approved by San Miguel County in 1981. The center of the Town is located at the base of the Telluride Ski Area and contains the terminal of the main gondola, which reaches the Town from Telluride. The Town also contains single family and duplex residential units, residential condominium units, hotel rooms, commercial space and facilities for recreational activities such as golf, tennis, swimming and other outdoor activities. As of January 2, 1996, the Town had approximately 505 residents who were qualified to vote. Including persons under 18 years, the Town had approximately 568 residents.

Before the Town was incorporated, it was a part of unincorporated San Miguel County. At an election on January 17, 1995, the Town received voter approval to incorporate under Colorado law. There were 268 registered voters entitled to vote in this election, all of whom were residents of the Town. Forty-one persons voted in this election, 40 voting for the incorporation, and one against.

On March 7, 1995, a Town election was held on whether to approve a proposed home rule charter for the Town (hereafter, the "Charter"). Only registered voters who were residents of the Town were entitled to vote in this election. Fifty-three residents voted; 40 voted to approve the Charter, 13 voted against doing so.

4

On March 10, 1995, the Colorado District Court for San Miguel County issued an order declaring that the Town had been validly incorporated, and that it had adopted a Home Rule Charter under the provisions of Article XX of the Colorado Constitution.[2]

Section 2.4(a) of the Charter granted the right to vote to all residents of the Town, so long as they had been legal residents for at least 180 consecutive days immediately prior to the election, and were at least 18 years old on the date of the election.[3]

Section 2.4(b) of the Charter granted the right to vote to owners of real property located within the Town, who are not legal residents of the Town, so long as they: a) have been owners of record for at least 180 consecutive days immediately prior to the date of the election; (b) during that 180 days owned a minimum of 50% of the fee title interest in certain real property; (c) are at least 18 years old on the date of the election; and (d) are natural persons. Ownership of both residential and commercial real property entitles the owner to vote, but ownership of parking spaces, hotel units, roads or common areas does not qualify voters. Section 2.4 (d) of the Charter further provides that there may only be one vote cast per person, regardless of whether or not he or she

---

[2] Article XX §6 (d) of the state Constitution gives the full right of self-government in both local and municipal matters to municipalities, and to home rule towns, the power to "legislate upon, provide, regulate, conduct and control . . . [a]ll matters pertaining to municipal elections in such . . . town. . . . "

[3] Pursuant to a later resolution and a special election held on April 4, 1996, the residence requirement was reduced to 30 days. This reduction was passed by a vote of 126 to 55.

may be a qualified Legal Resident and/or own one or more parcels of qualified real property. (Appellees' Supp Appendix at p. 38)

Section 1.4(b) of the Charter sets out the reasons for extending the vote to nonresidents:

> (b) Provision for Non-resident Voting Rights. Certain non-resident property owners have been extended voting rights concerning municipal and local affairs based upon the following reasons:
>
> 1. Like many resorts, the nature of the economy and the life-style of the people of the Town are, and will in the future remain, unusual. Furthermore, the fact that many of the Town's present and future residential and commercial property owners maintain their primary residences outside of the Town, making them part-time second-home non-residents, is also unusual. Although these facts are not substantially different from most resort towns, they are very unusual for conventional small as well as large towns.
>
> 2. The framers of this Charter took cognizance of the above-mentioned singular state of affairs, most especially the fact that a large number of the property owners of the Town are, and will continue to be, only part-time residents of their Town by granting to them the right to vote on those issues that are strictly limited in nature to Town matters. (Appellees' Sup. Appendix p. 35).

Pursuant to the Charter, an election for members of the town council was held on March 28, 1995. "There were thought to be" 268 resident voters eligible to vote at that time, and 39 voted. The Town mailed 490 ballots to nonresident property owners qualified to

vote pursuant to section 2.4(b) of the Charter, of whom 105 voted. The Town did not mail ballots to resident voters. [4]

As of January 2, 1996, a Town census disclosed that in addition to approximately 505 eligible resident voters in the Town, there were approximately 541 nonresident property owners eligible to vote pursuant to the Charter.

Nonresidents entitled to vote currently own over 34% of the assessed value of real property in the Town, while residents own only about 5%  About 61% of the assessed value of real property in the Town is owned by nonresident corporations and trusts, which are not entitled to vote in Town elections.  Nonresidents pay over eight times more in property taxes than the residents do, and it is fair to state that in the future such nonresident property owners will continue to contribute significant revenues to the Town. (Appellees Supp. App. at pp. 2) [5]

---

[4] It should be noted that the election held in March, 1995, when "there was thought to be 268 resident voters", was conducted at a time when a residency of 180 days was required.

At a meeting on January 9, 1996, the Town Council adopted a resolution stating that it would enact an ordinance amending the Charter in order to reduce the residence requirement to 30 days. A special election was subsequently conducted on April 4, 1996, at which time Section 2.4(a)(1) was amended to reduce the residency requirement to 30 days.  That measure passed by a vote of 126 to 55.  (See ¶¶ q, t, pp. 92, 93, Aplts. Appendix)

[5] For the tax year 1995 the total assessed value of real property in the Town was approximately $89,352,529 and the total real estate taxes levied against that property in 1995 was $6,419,356.

The assessed value of real property owned by residents of the town was approximately $3,896,918, with real property taxes levied against residents in the sum of $279,955.  From that tax sum, the Town received approximately $8,336 as part of the Town's law enforcement assessment.

7

Under its Charter, the Town has the right to establish land use standards, community services, municipal ordinances. to adopt capital improvement programs, establish property and other taxes, borrow money, issue bonds, create special improvement districts, to control public utilities and to condemn property. (Supplemental Appendix at pp. 42-43, §3.6, and pp. 62-65, §11.1.) By granting nonresident property owners the right to vote on issues limited to Town matters, the Charter gives those nonresidents a voice in the affairs of the Town, including taxes to be paid and how tax dollars will be spent.

## Discussion

We review summary judgment decisions de novo, Trierweiler v. Croxton and Trench Holding Corp., 90 F. 3d 1523, 1537 (10th Cir. 1996). We conclude that the District Court properly found that the constitutionality of the nonresident voting provisions of the Town Charter should be evaluated using the rational basis test. [6]

---

The assessed value of real property owned by nonresident property owners entitled to vote under section 2.4(b) of the Charter was approximately $30,912,699, and the taxes levied on that property were $2,221,038. Of those taxes received from non-residents entitled to vote, the Town received approximately $63,909 as part of the Town's law enforcement assessment. (Affidavit of Linda Check, Ex. 2, Appellees' Supplemental Appendix)

[6] In the briefs on appeal, plaintiffs dispute defendants' contention that in oral argument below, plaintiffs conceded that strict scrutiny of the voting provisions did not apply. Since we find that the great weight of authority supports application of the "rational basis" test, the question of plaintiffs' concession on this point is not material to our decision.

The guarantee of equal protection under our federal constitution was described by the Supreme Court in Harris v. McRae, 448 U.S. 297, 65 L. Ed. 2d 784, at 808, (1980):

> It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless "the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective." McGowan v Maryland, 366 U.S., at 425 . . . This presumption of constitutional validity, however, disappears if a statutory classification is predicated on criteria that are, in a constitutional sense, "suspect". the principal example of which is a classification based on race, e.g., Brown v. Board of Education, 347 US 483. . . .

In Harris the Supreme Court noted that while the guarantee of equal protection is not a source of substantive rights, an exception to that statement is to be found in Reynolds v. Sims, 377 U.S. 533, 12 L. Ed. 2d 506 (1964). Simms held that if a State adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment confers upon a voter a substantive right to participate in the electoral process equally with other qualified voters. See f.n. 25, Harris v. McRae, 65 L. Ed. 2d at p. 808, and see Dunn v. Blumstein, 405 U.S. 330, 336, 31 L. Ed. 2d 274, 280 (1972).[7]

_____

[7] The Reynolds decision involved the reapportionment of the Alabama legislature, and the unconstitutional dilution of the weight of votes depending upon the residence of the voters.

In Dunn a Tennessee resident successfully challenged state constitutional and statutory provisions which barred him from voting because he had not been a resident of the state for one year or a resident of the county for three months' time prior to the election.

9

Of critical importance to any decision here is the fact that Section 2.4(b) of the Town Charter does not restrict the right to vote – it expands it to include nonresidents owning real property in the Town. As pointed out by the District Court, "[w]here a law expands the right to vote causing voting dilution, the rational basis test has been applied by the vast majority of courts." May v. Town of Mountain Village, supra, 944 F. Supp. at p. 824.[8] Among such cases and most factually similar to the case before us are Spahos v. Mayor & Councilmen of Savannah Beach, Ga., 207 F. Supp. 688 (S.D. Ga), aff'd per curiam, 371 U.S. 206, 9 L. Ed. 2d 269 (1962), and Glisson v. Mayor and Councilmen of Town of Savannah Beach, 346 F. 2d 135 (1965). Under the facts of these two cases it

---

[8] Among the cases are those in the 5th and 11th Circuits dealing with Alabama law which permitted residents of cities with independent school systems to vote in county school board elections. See Sutton v. Escambia County Bd. of Educ., 809 F. 2d 770 (11th Cir. 1987); Davis v. Linville 864 F. 2d 127 (11th Cir. 1989); Creel v. Freeman, 531 F. 2d 286 (5th Cir. 1976), cert. den. 429 U.S. 1066, 50 L. Ed. 2d 784 (1977) The "rational basis" test was applied which depended in part upon whether the city residents had a substantial interest in the operation of the county school system. In many cases in which the requisite interest was found nonresident taxes or other economic contributions gave significant support to the county or rural school systems.

In a similar school district case from the 6th Circuit, the proper standard of review to apply when the franchise was expanded was discussed in Duncan v. Coffee County Tenn., 69 F. 3d 88, at p. 94 (6th Cir. 1995), which held that "[m]erely expanding the voter roles is, standing alone, insufficient to make out a claim of unconstitutional vote dilution."

In Collins v. Town of Goshen, 635 F. 2d 954, (2d Cir. 1980) Arcadia Hills, part of the Town of Goshen had its own water district whose officials were elected by all the residents of the Town, not just the residents of Arcadia Hills. This scheme was found to be rational because the Town had often advanced town taxes to keep the water district going.

10

appears that Savannah Beach was a resort town in Chatham County, Georgia, with a population of 1,385 persons, which was increased by an additional 2,500 persons during the summer. Under state law, non-residents of the town, who resided in the county, who owned real property in Savannah Beach were permitted to vote in Savannah Beach elections. In finding that this election scheme did not violate the equal protection clause of the 14th Amendment, the courts considered that the assessed value of property in the town was $4,414,295, of which $2,852,040 was returned by nonresidents, and that as of December, 1961, there were 549 persons registered to vote as permanent residents, and 443 were registered as non-residents, owning property in the town. A substantial majority of the nonresidents resided in Savannah Beach for periods of one to four months during the summer.

In Snead v. City of Albuquerque, 663 F. Supp. 1084 (D.N.M. 1987) Affd 841 F. 2d 1131, cert. den. 485 U.S. 1009, 99 L.Ed. 2d 704, residents of Bernalillo County, New Mexico, all but one of whom owned property in the City of Albuquerque, contested a municipal bond election. Local law provided the right to vote on creation of municipal debts to any person who owned property within the city limits who had paid a property tax during the preceding year, although there was no requirement of property ownership by residents of the City. The court held that the voter classification rationally limited the extension of the vote to those who were directly affected by the outcome of the election. It was particularly noted that one who resides outside of a

11

governmental unit has no fundamental right to vote, but a municipality can permit such persons to do so if there is a rational basis to find they are affected by the issue put to the vote.  663 F. Supp. at 1088.

A similar finding was made by the Colorado Supreme Court in Millis v. Bd. of Cty. Com'rs of Larimer Cty., 626 P. 2d 652 (Colo. 1981) where nonresidents of Colorado who owned vacation property in the High Drive Water District near Estes Park, Colorado were excluded from voting on water district matters.  It should be noted that at that time a Colorado statute expressly excluded out of state property owners from voting on water district matters, although Colorado residents, who did not live within the water district were allowed to vote on district matters.  In this case, it appeared that the water district consisted of about 120 to 130 residences or parcels eligible for water service, but only 9 of these were owned by full time residents, the majority being owned by out of state residents.  The water district was organized in 1974 by a vote of 27 to 21, and the district proposed to issue bonds for $350,000 to finance a water system.  The qualified voters in the district passed this proposal.  The out of state plaintiffs in the case were not allowed to vote. The Colorado court held that the voting scheme did not violate the state constitution since giving the vote to Colorado landowners and not to out of state landowners was a reasonable and rational choice since state residents could be presumed to have a special interest in urban development and its effect on the state's environment that

12

residents of other states might not have.[9]    In arriving at this decision, the Colorado court reviewed the law pertaining to the franchise in the state of Colorado in this manner:  (626 P. 2d at pp. 657-658)

> With respect to restrictions on the franchise, classifications based upon residency, citizenship, or age have never been considered suspect. . . (citations omitted).  Nonresidents do not have a fundamental right to vote in elections in this state. Jarmel v. Putnam, 179 Colo. 215, 499 P. 2d 603 (1972).  Indeed we have held that our legislature has the power to determine "the qualifications of voters in all public and quasi-municipal corporations and all reasonable provisions with reference thereto will be upheld." People ex rel Shaklee v. Milan, 89 Colo. 556, 560, 5 P. 2d 249, 251 (1931).  The fact that a nonresident owns land in this state does not create a fundamental right to political participation in decisions which affect that land. While nonresident landowners may be enfranchised, see People ex rel Cheyenne Soil Erosion District v. Parker, 118 Colo. 13, 192 P. 2d 417 (1948),[10] there is nothing in our constitution that requires they be given voting rights in a political subdivision where they do not live. (footnotes omitted, emphasis supplied).

---

[9]   In the Millis case the out of state property owners also filed a separate suit on the issue in the Colorado federal district court, raising federal constitutional claims.  The federal court found that a rational basis for excluding out of state owners existed and dismissed the case;  Millis v. High Drive Water District, (No. 75-M-1021 (D.C. Colo. Jan. 18, 1978, affirmed without opinion, Mills v. High Drive Water District, 439 U.S. 802, 58 L. Ed. 2d 95 (1978).  In ruling on the state issues, the Colorado Supreme Court followed the federal court's reasoning. See 626 P. 2d at p. 658.

[10]   The Parker case arose under the Colorado Soil Conservation Act amendment which extended voting rights to nonresidents, corporations and others owning land in soil erosion districts.

13

In the case before us, the uncontroverted evidence discussed above supports the District Court's conclusion that:

> Plaintiffs have failed to show that the Defendants' reason for allowing nonresident landowners to vote in the Town. . . is either irrational or arbitrary. I find credible Defendants' contentions that the Town. . . is a unique resort community where nonresident landowners own the majority of property and pay more than eight times the amount of property tax. Defendants further assert that without the significant revenues the nonresident landowners have contributed to the Town, the Town might never have come into existence. Moreover, the nonresidents continue to bear the weight of the financial burden for the Town. Defendants argue that providing the nonresident landowners the right to vote gives them a voice in the Town's future, including the taxes they will have to pay and how those taxes should be spent. . . These factors demonstrate that the Town had a rational basis for enacting the Charter provision granting nonresident landowners the right to vote. (944 F. Supp. at 825)

**Summary**

Simply stated, the issue in this case must turn upon the uncontroverted fact that the Town of Mountain Village was incorporated pursuant to the overwhelming vote of registered voters, all of whom were residents of the Town. Following that incorporation, registered voters, again all residents of the Town, approved by an overwhelming majority the Home Rule Charter at issue in this case. Under Article XX of the Colorado constitution Home Rule Towns have the power to "legislate upon, provide, regulate, conduct and control . . . all matters pertaining to municipal elections" (emphasis supplied). Section 1.4(b) of the Charter specifically sets out the reasons for extending the vote to nonresidents of the

14

Town, in particular recognizing the special nature of the resort community. There is no evidence in this case of any suspect classification of voters and equal weight is to be given to the votes of residents and nonresidents. With nonresident voting power limited to those owning at least 50% of the fee title to real property, there is no possibility of "loading up" the nonresident vote through excessive partitions of a piece of property, as was the case in Brown v. Board of Com'rs of Chattanooga, Tenn., 722 F. Supp. 380 (E.D. Tenn. 1989) where as many as 23 nonresidents were registered to vote on a single piece of property.[11]

In this case it is clear that the nonresident property owners have a sufficient interest in Town affairs to make it rational for the Town to include them in the political process. Currently they pay approximately eight times more real property taxes in property taxes, and under the Charter, the Town has the power to establish land use standards, enact ordinances, adopt capital improvement programs, set tax rates, borrow money, issue bonds, create special improvement districts, control utilities, and to condemn property. Each of these powers has great potential to affect property owners in significant respects. See Bjornestad v. Hulse (Sierra Lakes

_____

[11] The Brown case involved the improper dilution of the black vote in Chattanooga by voting provisions which extended the franchise to nonresidents who owned trivial amounts of real property in the city. In the 1988 election there were 547 nonresidents who had registered to vote, 427 of whom were white persons. The court found that a provision which gave a vote to a nonresident who owned a 1/15th interest in a lot assessed at $100 did not further any rational government interest, and so the voting scheme violated the equal protection clause of the 14th Amendment.

15

<u>Water Dist.)</u> 281 Cal. Rptr 548 (Cal App 1991), where the court con-cluded that the rational basis test must be applied to an Equal Protection vote dilution claim based upon the enfranchisement of nonresident landowners in a special district election. [12]

In light of the foregoing factors, it is clear that the district court correctly concluded that the nonresident property owners in the Town of Mountain Village have a substantial interest in township elections, and under such circumstance, the order of the district court granting summary judgment to defendants is AFFIRMED.

---

[12] In <u>Bjornestad</u>, even nonresident commercial entities owning property in the water district were given the vote by proxy. The court noted that the particular nature of the Sierra Water District was of persuasive importance. At the time, it was primarily a second-home, vacation community with a relative low number of permanent residents. The district was in an area of "tremendous snowfall", and its financial burdens were borne largely by its landowners.