Morgan I. LEVY, Rolando Oses, Marsha Matson, Shirley Gibson, Robert P. Harrison III, William L. Budd, Mervyn Adirim, Doretha Nichson, and Miles E. Moss, Plaintiffs,

v.

MIAMI–DADE COUNTY, a political subdivision of the State of Florida, Defendant.

No. 01–101–CIV.

United States District Court, S.D. Florida.

Feb. 27, 2003.

Eugene E. Stearns, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, for plaintiffs.

Robert A Duvall, III, Lee Alan Kraftchick, Dade County Attorney's Office, Miami, FL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

UNGARO–BENAGES, District Judge.

THIS CAUSE was tried before the Court between October 21–24, 2002.

THE COURT has considered the pertinent portions of the record and is otherwise fully advised in the premises.

Plaintiffs, residents of the unincorporated area of Miami–Dade County, Florida, bring this action under the Equal Protection Clause, alleging that their right to vote is being unlawfully diluted because non-residents of the unincorporated area (*i.e.*, city residents) participate in the election of the Unincorporated Municipal Services Area's ("UMSA") governing body.[1] Plaintiffs also contend that the County has violated the Equal Protection Clause by imposing conditions on future incorporations that have not been imposed on existing cities. Finally, Plaintiffs allege that Defendant has violated certain budgeting requirements under state law.

On February 12, 2002, this Court issued an Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment ("Order"). In that Order, the Court limited the issues for trial to the following:[2]

(1) Whether Plaintiffs could propose a viable, constitutional remedy to their alle-

---

1. The Plaintiffs' claim arises from the fact that the Miami–Dade County Commission serves as the governing body of both the County as a whole and of the unincorporated area as a quasi-municipality. *See infra* at ¶¶ 20–45. City residents are, of course, entitled to participate in County elections because they are County residents.

2. At trial, the parties advised the Court that Plaintiffs would not pursue a fifth claim left unresolved upon Defendant's Motion for Summary Judgment. Namely, whether County employees "knowingly omitted significant facts regarding UMSA revenues and expenditures from the public." Order at 30. Consequently, it will be dismissed without prejudice. Fed.R.Civ.P. 41(a)(1)(ii).

gation of overinclusion supporting a justiciable claim, and, if so, whether it is rational to allow city residents of the County's municipalities to participate in the election of the governing body of the unincorporated area based on their substantial interest in the first-tier, municipal government provided by the County.

(2) Whether there is a rational basis for the imposition of certain conditions on new cities pursuant to the October 3, 2000 Amendment to the Home Rule Charter.

(3) Whether Defendant has effectuated a "division of county revenues derived from or on behalf of ... [the] unincorporated area." Fla. Stat. § 129.01.

These issues were tried before the Court between October 21–24, 2002. The parties submitted post-trial memoranda on December 4, 2002, and the Court heard closing argument on December 20, 2002. Pursuant to the Court's request, the parties supplemented the record on February 13, 2003, filing a "Joint Response to the Court's Questions" ("Joint Response"). The following findings and conclusions are based on the Court's pretrial rulings, the Parties' stipulations,[3] and the evidence submitted at the non-jury trial. For the reasons that follow, the Court finds:

(1) Plaintiffs' challenge to Defendant's voting system is not justiciable. The Plaintiffs have not shown that any judicially available remedy can cure the purported voting defect they identify. In the alternative, Plaintiffs have not shown that Defendant lacks a rational basis for allowing city residents to participate in the election of the unincorporated area's governing body. In fact, city residents have a substantial interest in the affairs of the metropolitan government stemming from their receipt of services from, payment of taxes to, and sharing of County government with, the unincorporated area.[4]

(2) Plaintiffs have not shown the absence of a rational basis for imposing conditions on future incorporations that have not been imposed on existing cities.

(3) Plaintiffs have not shown that the County's budget system violates Fla. Stat. § 129.01.[5]

---

**3.** The parties have stipulated to a considerable number of facts in their Combined Stipulation (*"Comb.Stip."*). Most have been included herein.

**4.** Based on the parties' summary judgment papers, the Court concluded that the unincorporated area was a "geopolitical jurisdiction" and that, therefore, the Court was required to conduct a substantial interest analysis. Order at 14–21. *See also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (citing *Adickes*). To be clear, however, the Court also concluded that the UMSA was not actually a municipality, stating: "Neither the State's constitution, nor its laws, nor its courts adhere to the proposition that the UMSA actually is an incorporated municipality." Order at 27. *See also Ocean Beach Heights v. Brown–Crummer Inv. Co.*, 302 U.S. 614, 619, 58 S.Ct. 385, 82 L.Ed. 478 (1938) ("In the absence of a law authorizing the creation of a municipality de jure there can be none de facto.").

Now that the record is complete, the undersigned is unable to agree with Plaintiffs that the UMSA is a jurisdiction sufficiently distinct from the County to require the Court to undertake a substantial interest analysis. Nevertheless, reasonable minds could differ on the issue and, therefore, the Court has gone on to consider whether Plaintiffs have shown that Defendant's system of UMSA governance is wholly irrational. *See infra* § I.B. *See also Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671 (1980).

**5.** In its Order on Summary Judgment, the Court resolved all alleged budgetary violations except as claimed under Fla. Stat. § 129.01. *See* Order at 27 n. 26. In their Proposed Findings, Plaintiffs assert additional statutory violations and an equal protection claim. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Pls.' Proposed Findings") at 53–54. However, these claims

### FINDINGS OF FACT

1. Plaintiffs are citizens and residents of Miami–Dade County who reside outside the boundaries of any of the County's existing, formally structured municipalities.[6] The area in which Plaintiffs reside is known as the "unincorporated" area. *Comb. Stip.* ¶ 1.

2. Miami–Dade County is a political subdivision of the State of Florida. *Comb. Stip.* ¶ 2.

### A. County Structure and Organization

3. The manner in which local government is organized within Miami–Dade County is provided by a special provision of the Florida Constitution, first adopted in 1956 as an amendment to Article VIII, section II of the Florida Constitution of 1885, which permitted the citizens of Dade County to adopt a county charter to prescribe the manner of governance of local affairs. In 1957, the voters of Dade Coun-

ty approved the adoption of the "Dade County Home Rule Charter."[7] From that time to the present, Miami–Dade County has been governed pursuant to the Charter. *Comb. Stip.* ¶ 3.

4. In 1968, the Florida Constitution was revised substantially. However, section 6(e) of Article VIII carried forward, and specifically validated, the existing Home Rule Charter.[8] Additionally, section 6(f) was added bestowing upon the County all of the powers conferred by general law upon municipalities.[9] *Comb. Stip.* ¶ 4.

5. Today, Miami–Dade County consists of 32 separate, incorporated municipalities and a large unincorporated area labeled the Unincorporated Municipal Services Area. The former consists of 47.6% of the County's residents, while the latter includes the remaining 52.4%. *Comb. Stip.* ¶ 5.

6. The County is governed by a thirteen member Board of County Commis-

are not in issue and the Court will not address them at this late stage. *See generally* Fed. R.Civ.P. 8(a).

6. Historically, Miami–Dade County bore the name "Dade County." In 1998, the voters approved a charter amendment adopting the name "Miami–Dade County." Because these findings discuss historical events that overlap the name change, the County is referred to herein by both its past and present name.

7. Because prior to the adoption of the County Charter local decisions were largely made by special act of the Florida legislature, and because the effect of the special amendment to Florida's Constitution allowed Dade County's citizens to choose the manner of their own governance, the charter adopted in 1957 pursuant to the special provision of the Florida Constitution was called the Dade County Home Rule Charter.

8. Section 6(e), entitled "Consolidation And Home Rule." reads as follows:
Article VIII, Sections 9.10, ii (the Dade County Home Rule Charter) and 24, of the Constitution of 1885, as amended, shall re-

main in full force and effect as to each county affected, as if this article had not been adopted, until that county shall expressly adopt a charter or home rule plan pursuant to this article. All provisions of the Metropolitan Dade County Home Rule Charter, heretofore or hereafter adopted by the electors of Dade County pursuant to Article VIII, Section II, of the Constitution of 1885, as amended, shall be valid, and any amendments to such charter shall be valid; provided that the said provisions of such charter and the said amendments thereto are authorized under said Article VIII, Section II of the Constitution of 1885, as amended.

9. Section 6(f), entitled "Dade County; Powers Conferred Upon Municipalities." reads as follows:

To the extent not inconsistent with the powers of existing municipalities or general law, the Metropolitan Government of Dade County may exercise all the powers conferred now or hereafter by general law upon municipalities.

sioners ("Commission" or "Board") elected from single member districts. *See Meek v. Metropolitan Dade County,* 908 F.2d 1540 (11th Cir.1990), *reh'g denied,* 918 F.2d 184 (1990), *cert. denied,* 499 U.S. 907, 111 S.Ct. 1108, 113 L.Ed.2d 217 (1991), *op. after remand,* 985 F.2d 1471. The County Charter formally was amended on September 10, 2002, to reflect the Court's expansion of the Commission from nine to thirteen members. *Comb. Stip.* ¶ 7.

7. The Commission is the "legislative and governing body of the county and [has] the power to carry on a central metropolitan government." *Comb. Stip.* ¶ 8 (quoting Charter, art. 1. § 1.01(A)).

8. The County is structured as a two-tier government. On the first-tier, the County provides local government and services to the UMSA. On the second-tier, the County provides a variety of services on a countywide basis. *Comb. Stip.* ¶ 9.

9. On the first-tier, utilizing the powers conferred upon it by the County Charter, the County Commission serves as the governing body for municipal decisions affecting only unincorporated area citizens. Among other things, within the unincorporated area, the County Commission regulates development (*e.g.,* adopting zoning codes and a development master plan, authorizing zoning variances, and issuing permits) and adopts and amends ordinances. *Comb. Stip.* ¶ 10.

10. The County also provides local services to the UMSA, including, among others: development regulation (zoning, code enforcement, and building regulation), local police, fire-rescue, local roads and streets, local park and recreation facilities, garbage and trash collection and public area maintenance. To pay for these municipal services, Miami–Dade County, using the powers granted to it by the Charter (and Florida law), levies taxes solely on the citizens, property, and commercial activities within the unincorporated area. *Comb. Stip.* ¶¶ 9 & 11.

11. Residents of the incorporated municipalities receive their first-tier, local government and services through their respective municipal governments. *Comb. Stip.* ¶ 12.

12. On the second tier, countywide services include: the Miami International Airport, Miami–Dade Transit System, Miami–Dade Public Health Trust, correctional facilities, regional parks, maintenance of the Northwest wellfield, and environmental protection. *Comb. Stip.* ¶ 13.

13. Countywide services are paid for by taxes paid by all County residents. *Comb. Stip.* ¶ 14.

14. Pursuant to the Florida Constitution, all County residents are entitled to participate in County elections. *Comb. Stip.* ¶ 15; Fla. Const., art. 8, §§ 6 and 11.

### B. Miami–Dade County and its Municipalities

15. The County's 32 municipal governments are of varying geographical magnitude, population, and financial ability. The ability of a municipal government to provide services is affected by a number of factors. Significant among those factors is financial ability. A generally recognized measure of financial ability is the municipality's per capita tax base, which is derived by dividing the total municipal population by the total assessed value of taxable property located within municipal boundaries. The population and per capita tax base of the existing municipalities, as compared to the per capita tax base of the unincorporated area specifically, is as follows:

*Total Assessed*                    *Per Capita*

| Value ($1,000s) | Population | Tax Base | City |
|---|---|---|---|
| $15,346,095 | 364,001 | $ 42,159 | Miami |
| $ 9,398,715 | 88,158 | $ 106,612 | Miami Beach |
| $ 6,531,014 | 42,746 | $ 152,787 | Coral Gables |
| $ 5,532,832 | 230,059 | $ 24,050 | Hialeah |
| $ 3,914,282 | 25,903 | $ 151,113 | Aventura |
| $ 2,731,834 | 10,607 | $ 257,550 | Key Biscayne |
| $ 2,072,601 | 19,064 | $ 108,718 | Pinecrest |
| $ 1,819,068 | 15,534 | $ 117,102 | Sunny Isles Beach |
| $ 1,723,698 | 22,676 | $ 76,014 | Miami Lakes |
| $ 1,387,536 | 59,688 | $ 23,246 | North Miami |
| $ 1,210,331 | 40,929 | $ 29,571 | North Miami Beach |
| $ 1,096,293 | 3,317 | $ 330,507 | Bal Harbour |
| $ 814,900 | 10,716 | $ 76,045 | South Miami |
| $ 734,743 | 1,115 | $ 658,962 | Medley |
| $ 690,011 | 32,300 | $ 21,363 | Homestead |
| $ 644,324 | 13,684 | $ 47,086 | Miami Springs |
| $ 566,545 | 19,655 | $ 28,824 | Hialeah Gardens |
| $ 515,114 | 5,035 | $ 102,307 | Surfside |
| $ 440,803 | 10,430 | $ 42,263 | Miami Shores |
| $ 420,087 | 14,795 | $ 28,394 | Opa-locka |
| $ 341,587 | 915 | $ 373,319 | Golden Beach |
| $ 327,953 | 5,150 | $ 63,680 | Bay Harbor Islands |
| $ 253,255 | 6,798 | $ 37,254 | North Bay Village |
| $ 243,172 | 14,260 | $ 17,053 | Sweetwater |
| $ 216,741 | 7,986 | $ 27,140 | Florida City |
| $ 198,692 | 33 | $6,020,970 | Indian Creek |
| $ 194,937 | 5,927 | $ 32,890 | West Miami |
| $ 114,685 | 2,348 | $ 48,844 | Virginia Gardens |
| $ 93,996 | 3,289 | $ 28,579 | Biscayne Park |
| $ 52,025 | 2,535 | $ 20,523 | El Portal |
| $ 244 | 6 | $ 40,667 | Islandia |
| $45,805,383 | 1,206,210 | $ 37,975 | UMSA |

*Comb. Stip.* ¶ 24 (Updated at trial as Exhibit 47B).

16. To be distinguished from tax ability (the financial wherewithal of a particular government to tax) is tax effort (the millage rate actually imposed). The following chart of current property tax millage rates illustrates the range of tax effort of the various municipalities as compared to the tax effort of the UMSA:

| Per Capita Tax Base | Total Comprehensive Millage [10] | City | Average Millage |
|---|---|---|---|
| $6,020,970 | 12.8642 | Indian Creek | |
| 658,962 | 11.1260 | Medley | |
| 373,319 | 11.7930 | Golden Beach | |
| 330,507 | 5.9820 | Bal Harbour | |
| 257,550 | 4.0570 | Key Biscayne | |
| 152,787 | 6.2920 | Coral Gables | |
| 151,113 | 5.4300 | Aventura | |

10. The Court infers that those municipalities levying a millage rate greater than 10 mills do so with voter approval. *See infra* at ¶ 17.

| | | | |
|---|---|---|---|
| 117,102 | 5.8530 | Sunny Isles Beach | |
| 108,718 | 5.3030 | Pinecrest | |
| 106,612 | 9.7370 | Miami Beach | |
| | | | 7.84372 |
| 102,307 | 8.3550 | Surfside | |
| 76,045 | 9.5760 | South Miami | |
| 76,014 | 6.2600 | Miami Lakes | |
| 63,680 | 7.7520 | Bay Harbor Islands | |
| 48,844 | 8.0460 | Virginia Gardens | |
| 47,086 | 11.6150 | Miami Springs | |
| 42,263 | 11.2671 | Miami Shores | |
| 42,159 | 11.1640 | Miami | |
| 40,667 | 10.4510 | Islandia | |
| 37,254 | 9.4841 | North Bay Village | |
| | | | 9.39702 |
| 32,890 | 11.6980 | West Miami | |
| 29,571 | 12.0423 | North Miami Beach | |
| 28,824 | 9.6830 | Hialeah Gardens | |
| 28,579 | 11.9030 | Biscayne Park | |
| 28,394 | 12.5520 | Opa-locka | |
| 27,140 | 12.1030 | Florida City | |
| 24,050 | 7.5280 | Hialeah | |
| 23,246 | 11.5750 | North Miami | |
| 21,363 | 11.7030 | Homestead | |
| 20,523 | 11.9030 | El Portal | |
| 17,053 | 6.6517 | Sweetwater | |
| | | | 10.84927 |
| **37,915** | **5.6500** | **UMSA** | |

*Comb. Stip.* ¶ 25. Thus, although the UMSA's tax ability exceeds that of at least 12 of the 32 existing municipalities, the tax effort that the County requires of UMSA residents is less than the tax effort that those 12 cities require of their property owners.

17. The State of Florida limits the revenue sources available to municipal governments to provide municipal services, allowing imposition of property taxes of up to 10 mills (a higher millage rate may be adopted with voter approval), utility taxes (not to exceed 10% of a utility charge), public utility franchise fees, and occupational license fees. In addition, municipalities are permitted to assess charges for services they render. *Comb. Stip.* ¶ 38.

18. The State of Florida also limits the revenue sources available to counties to provide county (as distinguished from municipal) services. Among other revenue sources, the governing bodies of counties are permitted to levy property taxes of up to 10 mills (a higher millage rate may be adopted with voter approval). Citizens of counties who reside outside of municipal boundaries receive their municipal services from the county governments. *Comb. Stip.* ¶ 39.

19. While prohibiting county governments from using countywide revenues to pay for municipal services in unincorporated areas, Florida law permits counties to levy taxes on unincorporated area citizens and property to finance municipal services within that area. The Miami–Dade County Charter similarly provides:

The Board shall be entitled to levy in the unincorporated areas all taxes authorized to be levied by municipalities and to receive from the state any reve-

nues collected in the unincorporated areas on the same basis as municipalities. *Comb. Stip.* ¶ 40

### C. Miami–Dade County and the Unincorporated Municipal Services Area

20. The unincorporated area of Miami–Dade County encompasses a vast geographical area and a population of about 1.2 million people. Although a substantial part of the land area of the unincorporated area is undeveloped and rural, much of it contains substantial residential and commercial development. *Comb. Stip.* ¶ 6.

21. The unincorporated area can be described as a unique geopolitical jurisdiction within Miami–Dade County by virtue of its geographical boundaries and governmental structure. *See, e.g.,* Order at 19 n. 21. However, it is not a "local governmental entity," *see, e.g.,* Fla. Stat. § 218.31, a municipality,[11] Fla. Const., art. VIII, §§ 2 & 6; Fla. Stat. § 171.031, a county agency, Fla. Stat. § 11.454, a county department, T. 473, or a special district within the County. Fla. Stat. § 189.403.[12] Moreover, the UMSA does not have a separate governing or administrative body, does not have the right to own property, and cannot be sued in its own right. T. 437–38.

22. Historically, Defendant has taken inconsistent positions with respect to whether the unincorporated area is a separate political entity, generally endeavoring to view the UMSA as a *de facto* municipality when it served Defendant's economic

interests to do so; taking the opposite position when it did not. For example, in response to an inquiry by one of the Plaintiffs in this action, the Miami–Dade County Manager stated as follows:

> You claim the unincorporated area is not a city because it is not incorporated. Yes, the unincorporated area is not an incorporated city. However, with the approval of the Home Rule Amendment to the State Constitution in 1956 and with the subsequent adoption of the Miami–Dade County Home Rule Charter in 1957, the unincorporated area of Miami–Dade County UMSA *was given the status of a municipality.* It may not be convenient for you or other proponents of incorporation to acknowledge that fact; it is valid nonetheless.

Pls.' Ex. 35 (emphasis added).

23. The UMSA also is treated as a municipality by Defendant in order to secure state revenue sharing, *see* Pls.' Ex. 33A ("Local Government Financial Information Handbook," 2001 Edition, Table 1 at 83–93) (detailing municipal revenue sharing distributions including those for UMSA); T. 307, 430–31, and for tax purposes wherein it levies municipal *ad valorem*, utility, and franchise taxes.[13] T. 98–100, 168–69 & 299–302; Def.'s Ex. D–12. *See infra* at ¶¶ 54–56.

24. The County also has identified UMSA as a discrete, electoral jurisdiction for the purpose of approving incorporations. One of the proposed "means" by

---

**11.** However, for budgeting purposes, "[i]n accordance with [Defendant's] Home Rule Charter, the unincorporated area is *treated as municipality.*" Pls.' Ex. 25 at 4 ("2000–2001 Proposed Operating Budget") (emphasis added).

**12.** Plaintiffs describe UMSA as "[t]he vehicle chosen by Dade County to operate and pay for municipal services within unincorporated areas." Pls.' Proposed Findings at ¶ 17.

**13.** Indeed, Defendant has argued successfully to the Florida Supreme Court that "UMSA [is] tantamount to an incorporated municipality subject to the governance of the County Commission." Order at 17 (citing *State ex rel. Dade County v. Nuzum,* 372 So.2d 441, 443–44 (Fla.1979); *Belcher Oil Co. v. Dade County,* 271 So.2d 118, 120–21 (Fla.1972); *State ex rel. Dade County v. Dickinson,* 230 So.2d 130, 131 (Fla.1969); *State ex rel. Dade County v. Brautigam,* 224 So.2d 688, 692 (Fla.1969)).

which an area within the UMSA could incorporate was by submitting its incorporation "to an UMSA-wide vote." *Comb. Stip.* ¶ 19; *see also infra* at ¶ 28.

### D. Brief History of Incorporation in Miami–Dade County

25. Until 1957, the decision of whether or not to create new municipal governments in Miami–Dade County rested with the Florida legislature. However, with the passage of the Dade County Home Rule amendment in 1956, and the adoption of the Dade County Home Rule Charter in 1957, the decision of whether to permit unincorporated areas to be annexed into existing cities or to form new cities was transferred to the County Commission. Since 1957, several annexations have been approved and seven new municipalities have been established. *Comb. Stip.* ¶ 16.

26. Between 1957 (when the County's metropolitan form of government was first established) and 1990, only one new city, Islandia, was created and one, Pensuco, was dissolved. In 1991, the Village of Key Biscayne was formed with County Commission approval. Several years later the Village of Pinecrest and the City of Aventura were organized with the approval of the County Commission. These were followed by the incorporation of the City of Sunny Isles Beach. Each new municipality independently approved municipal charters, elected governing bodies, and commenced providing municipal services by levying municipal taxes. *Comb. Stip.* ¶ 17.

27. Between 1992 and 1997, the Board of County Commissioners created several advisory committees and task forces to study incorporation. In 1997, the Commission imposed a moratorium on incorporation to permit further study of its effects on the County and the unincorporated area. *Comb. Stip.* ¶ 18.

28. The moratorium was lifted in April 1999, when the County Manager recom-mended that future incorporations be allowed on certain conditions. Specifically, the Manager recommended "that future incorporations will *only* be allowed to proceed to their completion if A and B occur or A and C, as described below."

A. The proposed new city agrees to remain within the Miami–Dade Fire and Rescue District, Miami–Dade Public Library System, the County solid waste collection system and to continue to receive specialized law enforcement services from the Miami–Dade Police Department; *and*

B. The boundaries of the proposed incorporation are drawn to ensure the area is revenue neutral or, in the case of donor areas, the new city agrees to mitigate the adverse fiscal impact caused by the new incorporation on the remaining unincorporated area; or

C. The proposed incorporation is submitted to an UMSA-wide vote. The Board should deny incorporation requests from all requesting areas that would have an adverse fiscal and service impact on the remaining residents of unincorporated Miami–Dade unless an UMSA-wide vote is held.

Pls.' Ex. 46 at app. X ("Incorporation and Annexation Report and Policy Recommendations") (emphasis in original).

29. The imposition of these new conditions was intended both to maintain the economies of scale sustaining the continued provision of services within the UMSA and to protect against a loss to the UMSA tax base that seemed likely to result if wealthy or "donor" areas incorporated and left insubstantial resources to provide municipal services to poor communities remaining in the UMSA. T. 70–75, 408–423.

30. Initially, the County Commission did not formally adopt the County Manag-

er's recommendations opting instead to pass a resolution calling for an amendment to the County Charter as proposed by the following question on the October 3, 2000 ballot:

SHALL THE MIAMI–DADE COUNTY HOME RULE CHARTER BE AMENDED TO PROVIDE THAT WITH REGARD TO MUNICIPALITIES CREATED AFTER SEPTEMBER 1, 2000, THE PRE–AGREED CONDITIONS BETWEEN THE COUNTY AND THE PROSPECTIVE MUNICIPALITY WHICH ARE INCLUDED IN THE MUNICIPAL CHARTER CAN ONLY BE CHANGED IF APPROVED BY THE COUNTY COMMISSION PRIOR TO A VOTE OF QUALIFIED MUNICIPAL ELECTORS?

Def.'s Suppl. Ex. 17. The County electorate voted to approve the Charter Amendment. An analysis of the election reveals that the Amendment received equal support from voters in the unincorporated area and in cities. *Comb. Stip.* ¶ 20.

31. Notwithstanding that the Charter Amendment received voter approval, the Commission apparently was unable to reach a consensus on the County Manager's recommendations concerning the preconditions to incorporation until February 26, 2002, when the Commission finally passed an ordinance largely codifying the County's incorporation policy.[14] That ordinance, which is § 20–26 of the Miami–Dade County Code, requires the fiscal impact of an incorporation on the remainder of the unincorporated area be revenue neutral, and that each new municipality: (1) agree to remain part of the Miami–Dade County Fire–Rescue and Library districts in perpetuity; (2) contract with the Miami–Dade County Police Department to pay for the provision of specialized police services in perpetuity; and, (3) contract with the Miami–Dade County Police Department to pay for the provision of local services for at least three years. Def.'s Suppl. Ex. 13. Section 20–26 further provides that any new municipality that previously generated revenues greater than the cost of services provided to that area by the County make annual mitigation payments to achieve revenue neutrality. *Id.*

32. Then, on June 18, 2002, the Commission amended § 20–23 of the Miami–Dade County Code governing the Commission's consideration of proposed incorporation petitions. Although this section, as amended, empowers the Commission to consider any relevant factor, it requires consideration of, among other factors, the ability of the County to efficiently and effectively provide services to the remaining unincorporated areas and the financial impact of the proposed incorporation on the remaining unincorporated areas of Miami–Dade County.[15]

33. Between 1999 and 2002, the County created several municipal advisory committees to consider the incorporation of Miami Lakes, Palmetto Bay, Doral, Country Club Lakes, and West Kendall.[16]

14. Based on the record, it appears that instead of requiring that "A and B occur *or* A and C," the County determined that new incorporations must submit to A and B, disposing of the third condition (C) altogether. *See supra* at ¶ 28.

15. Section 20–7, providing for public hearings to consider petitions for boundary changes, also was amended on June 18, 2002, to ensure the Commission considers, among other factors, the fiscal impact of a boundary change on the revenue base of the unincorporated area. *See* Def.'s Suppl. Ex. 21.

16. Over the past ten years, six new cities have been incorporated, Key Biscayne, Aventura, Sunny Isles Beach, Pinecrest, Miami Lakes and Palmetto Bay. Two additional areas were approved for incorporation after trial, Doral

34. On December 5, 2000, citizens of the Miami Lakes area incorporated under conditions negotiated with the County and made binding by the Charter Amendment. Those conditions include continued use of County services, including police and fire, and the payment of a mitigation fee. *Comb. Stip.* ¶ 21.

35. On September 10, 2002, citizens of the Palmetto Bay area in south Miami–Dade also voted to incorporate under conditions negotiated with the County and made binding by the Charter Amendment. Consistent with §§ 20–23 and 20–26 of the Code, those conditions include continued use of County services, including police and fire, and the payment of a mitigation fee. The citizens of Palmetto Bay voted overwhelming (83% to 17%) to accept the charter with these conditions. *Comb. Stip.* ¶ 22.

36. In or about 1995, the citizens of the Doral area created the West Dade Federation to facilitate their incorporation efforts. T. 272–74. The co-founder of the Federation, a Plaintiff in this action, testified that the rules on incorporation changed, on at least six different occasions, during the eight years the Federation strove to obtain approval for incorporation. T. 272–82. To make matters worse, after the West Dade Federation and the County Manager finally arrived at an agreement for its incorporation, the County Commission repudiated the understanding insisting that citizens of the new city pay an even greater mitigation fee. T. 280–82. In fact, the Court takes judicial notice that the Commission only recently sanctioned the Doral area incorporation petition which was approved overwhelming by community voters on January 28, 2003.

37. Plaintiffs in this action challenge the restrictions to incorporation imposed by Miami–Dade County on the Town of Miami Lakes and Palmetto Bay, and proposed for municipalities that subsequently may be created. *Comb. Stip.* ¶ 23. Specifically, Plaintiffs complain Defendant: (1) imposes upon them burdens for incorporation different than those imposed upon existing municipalities; (2) imposes conditions on new incorporations on an *ad hoc* basis; and, (3) does so relying on a policy that is without rational basis.

### E. Correlation of Interests of City and UMSA Residents

#### (1) Receipt of Services

38. The Miami–Dade County Police Department provides patrol services to UMSA residents. It also provides specialized police services to both the unincorporated area and to those municipalities that have elected not to provide their own. *Comb. Stip.* ¶ 26.

39. The County also has entered into a formal agreement with local cities, permitting its officers to stop and apprehend suspects as they travel through cities. For example, a Miami–Dade officer traveling through the City of South Miami who sees a drunk driver is expected to stop the offender, investigate, and arrest if appropriate. While city officers are expected to do the same when they travel through the unincorporated area, due to the size of the unincorporated area and its noncontiguous nature, it is more common for Miami–Dade officers to make stops in cities than it is for city officers to make stops in the unincorporated area. *Comb. Stip.* ¶ 27.

---

and North Dade. If North Dade is incorporated, the new city will include over 100,000 residents, making it the third largest city in the County, after Miami and Hialeah. Several other incorporations are actively being considered, including East Kendall, West Kendall, the Redlands, Northwest Dade and North Central Dade.

40. The geographic layout of the unincorporated area causes Miami–Dade police to regularly patrol not only near city borders but also across city borders, through such cities as Sweetwater, South Miami, Miami, West Miami, Hialeah, North Miami, and North Miami Beach, as they travel from one part of their unincorporated patrol area to another. Indeed, there are several unincorporated pockets in the County that cannot be reached without traveling through one or more cities. The "High Pines" area, surrounded by the cities of Coral Gables, South Miami and Pinecrest, and "Little Gables," surrounded by Miami and Coral Gables, are but two examples. As a result of their frequent incursions into incorporated areas, Miami–Dade police annually make thousands of stops and arrests within city borders. *Comb. Stip.* ¶ 28.

41. Miami–Dade officers also frequently are called to back up city officers as they make arrests, handle disturbances, and even on routine traffic stops. *Comb. Stip.* ¶ 29. While city officers also back up Miami–Dade officers, again due to the size of the workforce and the geographic layout of the unincorporated area, it is more common for Miami–Dade officers to back up city officers than for city officers to back up Miami–Dade officers. T. 154–55; 506–07. For example, in the last year the Village of Pinecrest's police department responded to 243 calls from the Miami–Dade Police in the unincorporated area, while the Miami–Dade police responded to 430 calls from Pinecrest. T. 152, 513.

42. Miami–Dade officers also are called to respond in major emergencies, from riots to hurricanes. For example, Miami–Dade police responded in large numbers when race riots threatened to overwhelm the City of Miami's police force in the 1980's. *Comb. Stip.* ¶ 30. Similarly, when Hurricane Andrew devastated the City of Homestead and Florida City, leaving local police forces in disarray, the County ordered a curfew and enforced it with Miami–Dade police. T. 510. More recently, the Miami–Dade police set up a task force to apprehend a serial rapist in the new City of Palmetto Bay. *Id.* at 504.

43. Miami–Dade officers also are called upon by the cities when finances threaten their ability to provide their citizens with adequate police protection. For example, the City of Opa Locka recently asked Miami–Dade police to cover patrols that the city's own police force was too shorthanded to cover. The City actually has contemplated turning its entire police department over to the County. *Comb. Stip.* ¶ 31.

44. Miami–Dade police also frequently are called upon to cover special events in cities. Miami–Dade supplied 300 officers to provide security at a Labor Day event on Miami Beach. *Comb. Stip.* ¶ 32. The County Police Department also recently was assigned the task of coordinating training and assisting in the November 2002 elections, which included the election of municipal officials. T. 507–08.

45. Finally, Miami–Dade police provide specialized services that most cities simply cannot afford. Such services include a countywide crime laboratory, homicide detectives, a mounted patrol, a canine unit, a bomb squad, and a SWAT team. These services are funded mainly by countywide taxes. However, the County questions whether it would be able to maintain these services without the ability also to maintain the large uniformed patrol force, funded largely by unincorporated area taxes. *Comb. Stip.* ¶ 33.

46. With the exception of specialized police services, services provided by Miami–Dade police are funded mainly through UMSA taxes. Attempts are made to charge cities back for their utilization of routine services, but the County acknowledges that not every police service it pro-

vides city residents is paid for by city residents. *Comb. Stip.* ¶ 34.

47. The County Parks Department also provides services to both the UMSA and the municipalities. The Parks Department maintains essentially three categories of parks: regional, district, and local. Regional parks are the County's largest parks, such as Crandon and Haulover Park. The district parks (*e.g.*, Amelia Earhart, Tropical, Ives Estates, and Chapman Field) are somewhat smaller but still measure 200 acres or more. There are numerous local parks scattered throughout the County, including "mini-parks" (small, green spaces with perhaps a playground), neighborhood parks, such as Coral Reef, and single purpose parks (*e.g.*, tennis centers and a shooting range). All parks are funded by the revenue they generate and a tax subsidy. Regional parks receive their subsidy from countywide taxes, local parks in the UMSA from UMSA taxes, and district parks from a combination of both tax sources. *Comb. Stip.* ¶ 35.

48. Regardless of the source of revenue, all of the County's parks are open for the use of both city and UMSA residents. The programs offered at County parks, from softball leagues to boxing programs, are all open to city residents on the same terms as for unincorporated area residents, regardless of the park's size or location. Many local and district parks in the UMSA are adjacent or near to cities, and actually may attract more city residents than they do UMSA residents. Chapman Field, for example, is just outside Coral Gables and Pinecrest, and attracts residents from both cities. *Comb. Stip.* ¶ 36.

49. The County's largest wellfield, the Northwest Wellfield, which supplies potable drinking water to all residents in the northern half of the County, is located in the unincorporated area. City residents have an interest in insuring that this vital natural resource is protected. *Comb. Stip.* ¶ 37.

**(2) Payment of Taxes**

50. The County has the power to impose countywide *ad valorem* taxes not to exceed 10 mills. Currently, all County residents pay these taxes at the rate of 5.713 mills. Pls.' Ex. 48A ("2001 Millage Table").

51. UMSA and city residents also pay "municipal" level *ad valorem* taxes, not to exceed 10 mills, sales taxes, communications taxes, utility taxes, gas taxes, and state revenue sharing taxes. T. 430–431.

52. The County collects municipal level *ad valorem* taxes, Fla. Const., art. VII, § 9, and utility taxes, Fla. Stat. § 166.231, from UMSA residents, whereas the municipalities collect these taxes from their residents. Sales taxes, Fla. Stat. Ch. 218, gas taxes, Fla. Stat. Ch. 206, and taxes collected for revenue sharing, Fla. Stat. § 218.245, are collected by the State and then distributed to counties and municipalities according to state law. T. 430–431.

53. Under Fla. Stat. Ch. 218, all Florida counties and cities that meet certain basic qualifications are entitled to a portion of one-half cent of the state sales tax. The tax is collected from both city and unincorporated area residents, but distribution is not based on who paid the tax or where it was collected within the County. T. 358–359, 361. Instead, a statutory formula provides for counties to receive a portion of the tax collected within the county, calculated "by dividing the sum of the unincorporated area population plus two-thirds of the incorporated area population by the sum of the total county population plus two-thirds of the incorporated area population." Fla. Stat. § 218.62(2). Municipalities receive a portion calculated "by dividing the population of that municipality by the sum of the total county popu-

lation plus two-thirds of the incorporated area population." Fla. Stat. § 218.62(3). The formula takes into account a county's responsibility for providing services in its unincorporated area as well as countywide. T. 362–63. The funds received based on the unincorporated area population may be spent for unincorporated or countywide purposes. T. 359, 362.

54. The County also receives a portion of state sales taxes through the State's revenue sharing program. Fla. Stat. Ch. 218. The distribution of State revenue sharing, like the distribution of the one-half penny sales tax, is not based on point of collection alone. Counties receive such revenues based on their size, population, and percentage of sales taxes collected. Fla. Stat. § 218.245. Municipalities receive a portion of the sales taxes based on the city's population and its "relative local ability to raise revenues," calculated using several factors. *Id.* Miami–Dade receives state revenue sharing funds both in its countywide capacity and on behalf of the unincorporated area because it has successfully maintained that the unincorporated area is a "municipality" for revenue sharing purposes. Pls.' Ex. 25 at 296, 298; Pls.' Ex. 33A; *see also State ex rel. Dade County v. Nuzum,* 372 So.2d 441, 443–44

(Fla.1979); *State ex rel. Dade County v. Brautigam,* 224 So.2d 688, 692 (Fla.1969).

55. The County receives a variety of gas or "motor fuel" taxes under state law. It receives a "constitutional gas tax" under Sec. XII of the Florida Constitution based on a formula that takes into account the place of collection and the size and population of each county. Pls.' Ex. 25 at 326. The County has the discretion to use such funds as it sees fit for the construction and maintenance of roads throughout the County. *Id.* The County also receives revenue from the State's "county fuel tax" paid by all County residents.[17] Fla. Stat. § 206.41(b). It may be used for any transportation related purpose within the County. Fla. Stat. § 206.60. The County also receives a portion of the State's "municipal fuel tax" as a result of its status as the municipal government of the unincorporated area. Fla. Stat. § 206.41(c). It may be used for any transportation related purpose within the municipal area of origin. Fla. Stat. § 260.605. Finally, the County receives the proceeds of the State's "local option fuel tax," paid by all County residents, that it shares with eligible cities to be used for a variety of transportation

---

**17.** Section 206.41, entitled, "State taxes imposed on motor fuel" reads in pertinent part as follows:

(1) The following taxes are imposed on motor fuel under the circumstances described in subsection (6):

(a) An excise or license tax of 2 cents per net gallon, which is the tax as levied by s. 16, Art. IX of the State Constitution of 1885, as amended, and continued by s. 9(c), Art. XII of the 1968 State Constitution, as amended, which is therein referred to as the "second gas tax," and which is hereby designated the "constitutional fuel tax."

(b) An additional tax of 1 cent per net gallon, which is designated the "county fuel tax" and which shall be used for the purposes described in s. 206.60.

(c) An additional tax of 1 cent per net gallon, which is designated as the "municipal fuel tax" and which shall be used for the purposes described in s. 206.605.

(d) An additional tax of 1 cent per net gallon may be imposed by each county on motor fuel, which shall be designated as the "ninth-cent fuel tax." This tax shall be levied and used as provided in s. 336.021.

(e) An additional tax of between 1 cent and 11 cents per net gallon may be imposed on motor fuel by each county, which shall be designated the "local option fuel tax." This tax shall be levied and used as provided in s. 336.025.

. . .

purposes pursuant to Fla. Stat. § 336.025(7). Fla. Stat. § 206.41(e).

56. The unincorporated area receives services from the Miami–Dade Fire–Rescue and Library taxing districts. These services are funded primarily by *ad valorem* taxes collected from residents living in the Fire–Rescue and Library districts. With the exception of Miami, Miami Beach, Coral Gables, Hialeah and Key Biscayne, all of the County's municipalities, and the UMSA, are also part of the Fire–Rescue District and pay *ad valorem* taxes to the County to cover the cost of fire and rescue services. T. 297–98, 444–45. With the exception of Miami Shores, North Miami Beach, Hialeah and some smaller cities, all of the County's municipalities, and the UMSA, are part of the Library System and pay *ad valorem* taxes to the County accordingly. *Id.* The County Commission serves as the governing body of both districts. *Id.* These special districts are governed by the County Commission notwithstanding that the Commission is elected in part by persons who do not pay taxes to and who receive, at best, only indirect services from these districts. *Id.*

57. The tax revenues the County receives are no different than those received by other Florida counties, with the exception of state revenue sharing. T. 430–431. All counties receive *ad valorem*, sales, gas, communication, and franchise taxes and all charter counties are eligible to receive utility taxes. *Id.* However, Miami–Dade is currently the only county that receives state revenue sharing on account of its unincorporated area. *Id.;* T.307.

### (3) Issuance of Bonds

58. The County has the authority to issue bonds to finance capital improvements, such as building administration buildings or a zoo. T. 445–46. The unincorporated area does not own any property to pledge and therefore cannot itself issue bonds for capital projects. Thus, the County issues bonds for projects intended to benefit unincorporated area residents. T. 449–51. Historically, the bonds have been repaid using funds related to the purpose of the project; bonds for countywide projects are repaid using countywide revenues and bonds for unincorporated area projects are repaid with unincorporated area revenue. *Id.*

59. The County issued a bond in 1983 for $90 million, the majority of which was used for countywide purposes. T. 354–55, 446–48. The portion of the bond related to countywide projects was repaid with countywide funds. *Id.* However, in order to obtain a more favorable bond rating and interest rate, the County pledged utility tax revenue from the unincorporated area in support of the bond. *Id.* at 356, 448. Use of UMSA utility tax revenue was necessary because Defendant already had pledged all countywide sources of revenue for other purposes. T. 450.

60. The County's use of UMSA utility tax revenue to secure the bond created an opportunity cost wherein the revenue could not be used for the duration of the pledge for other projects benefitting UMSA citizens. T. 464–67. Additionally, the $90 million bond, and all other indentures secured by UMSA revenue, have tended to fuel an anti-incorporation bias within County government since each successive incorporation has reduced the amount of UMSA revenue available to secure the County's debt covenants.

### CONCLUSIONS OF LAW

**I. Equal Protection–Participation of City Residents in the Election of UMSA's Governing Body**

#### A. *Justiciability*

In cases involving voting rights, an area over which the states have primary jurisdiction, the courts have required

plaintiffs to demonstrate the availability of a judicial remedy in the liability phase of the case in order to overcome concerns of nonjusticiability.[18] To overcome this threshold, Plaintiffs:

> must show that the court "can fashion a permissible remedy in the particular context of the challenged system" to overcome concerns of nonjusticiability. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir.1999) (by contrast, "if [Plaintiffs] cannot establish that an alternate election scheme exists that would provide better access to the political process, the challenged voting practice is not responsible for the claimed injury.").

Order at 9. Accordingly, it is Plaintiffs' initial burden to demonstrate the existence of an alternative electoral scheme in the context of the existing system for the election of County Commissioners that directly addresses the alleged overinclusion and malapportionment but does not alter "the form and function of the County government." *Id.* at 8.

■ At trial, Plaintiffs attempted to satisfy this initial burden by offering weighted voting as a remedy for the claimed overinclusive electorate and resulting malapportionment that occurs by allowing city residents to participate in elections for the UMSA's governing body. Under this proposed remedy, whenever an UMSA matter is considered by the Board of County Commissioners the votes of com-

missioners would be weighted in proportion to the percentage of UMSA residents in their district.[19] *See* Pls.' Proposed Findings at 40–44.

In determining whether the Plaintiffs' weighted voting remedy is viable, there are well established requirements and limitations against which it must be measured. As will be more fully discussed below, the remedy must: (1) "directly address and relate to the constitutional violation itself," *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); and, (2) may not involve the restructuring of local government or the reallocation of governmental powers. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

### (1) Judicial Remedy Must Directly Address and Relate to the Violation

"The well-settled principle that the nature and the scope of the remedy are to be determined by the violation means simply that federal court decrees must directly address and relate to the constitutional violation itself." *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *accord, Freeman v. Pitts*, 503 U.S. 467, 489, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992) ("The authority of the court is invoked at the outset to remedy particular constitutional violations."); *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (same); *Rogers v.*

---

**18.** Although the concept of justiciability is "notoriously difficult" to define, it becomes more concrete when a court must determine the availability of an effective judicial remedy. *Wymbs v. Republican State Executive Committee of Florida*, 719 F.2d 1072, 1085 n. 34 (11th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1600, 80 L.Ed.2d 131 (1984).

**19.** At the time the parties filed their summary judgment memoranda, the thirteen districts and their respective percentage of UMSA vot-

ers were: District 1 (87.7%); District 2 (56.6%); District 3 (10.4%); District 4 (25.9%); District 5 (0.3%); District 6 (14.9%); District 7 (5.1%); District 8 (84.5%); District 9 (88.2%); District 10 (99.5%); District 11 (100%); and District 12 (59.9%); and, District 13 (12.9%). *See* Order at 3 n. 7. *See also* Pls.' Exs. 1B–1D. However, the Court notes that on November 15, 2001, the Commission adopted a redistricting plan following the 2000 Decennial Census.

*Lodge,* 458 U.S. 613, 628, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) ("Where a constitutional violation has been found the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'") (quoting *Milliken,* 433 U.S. at 282, 97 S.Ct. 2749); *Swann v. Charlotte–Mecklenburg, Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ("[T]he nature of the violation determines the scope of the remedy."); *LaMarca v. Turner,* 995 F.2d 1526, 1542–43 (11th Cir.1993) ("Relief must target the existing wrong."); *Lee v. Talladega County Bd. of Educ.,* 963 F.2d 1426, 1430 (11th Cir.1992) ("This rule follows from the settled principle that the remedial authority of the federal judiciary 'may be exercised only on the basis of a constitutional violation,' [citation omitted], and is limited to redressing the constitutional violation itself."); *Rybicki v. State Bd. of Elections of Illinois,* 574 F.Supp. 1082, 1124 n. 105 (N.D.Ill.1982) ("[T]he remedy should be designed to ameliorate the effects of unconstitutional vote dilution ... [by] providing specific remedies designed to cure specific unconstitutional features of the commission plan."). After careful consideration, the Court concludes that weighted voting would not cure the constitutional defect about which Plaintiffs complain.

At trial, the parties' voting rights experts agreed that Plaintiffs' remedial proposal of weighted voting fails to directly address or relate to the claimed overinclu-

sive franchise violation at the core of their voting rights claim. T. 247–250, 550; Briffault Dep. 59–60. The critical feature of any remedy that would directly correct this overinclusion, and the resulting malapportionment, would require "eliminating municipal voters from the election itself." T. 247–248. However, Plaintiffs' proposal would not alter the electorate at all. Not a single city voter would be excluded from voting for commissioners predominantly representing UMSA residents. Nor would the large deviation in the UMSA population between districts be reduced by a single percentage point. *See* Pls.' Ex. 1–D.

Instead of directly addressing the claimed overinclusion, Plaintiffs' weighted voting proposal attempts to ameliorate indirectly the "dilutive consequences" of the overinclusive electorate by enhancing UMSA voters' "ability to affect the outcome of decisions on the board ... when it concerns UMSA." T. 249, 252. The remedy is predicated upon the assessment of voting power in terms of the ability to affect the outcome of decisions by the Commission for the purpose of enhancing the representation of the distinctive interests of UMSA residents in the municipal services provided by the County.[20] However, the critical feature of "eliminating municipal voters from the election itself" would not be achieved. T. 247–248. Under the proposed weighted voting remedy city residents remain in the electorate.[21] *Id.*

---

**20.** At best, the proposal may result in some indeterminate reduction in the impact of city residents on County Commission decisions concerning UMSA matters. T. 253. There is no guarantee, however, that even this would occur. *See id.* Most importantly, the Supreme Court already has rejected similar attempts to assess voting power in terms of the ability to affect the outcome of board decisions. *See Board of Estimate v. Morris,* 489 U.S. 688, 697–698, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989).

**21.** In support of their proposed remedy, Plaintiffs cite to *Cunningham v. Municipality of Metropolitan Seattle,* 751 F.Supp. 899 (W.D.Wash.1990). *See* Pls.' Proposed Findings at 40. However, *Cunningham* specifically dealt with the one-person, one vote principle espoused in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Plaintiffs herein do not levy such a challenge.

On this point there is no dispute. Plaintiffs' expert, Dr. Engstrom, testified that he would not recommend the weighted voting proposal as a remedy for the overinclusion problem: "I would not recommend it to solve the overinclusion problem. The problem remains. Its effects may not be the same, but the problem remains."[22] T. 250. Dr. Lichtman agreed that Plaintiffs' proposed "remedy does not remedy overinclusion. You're still dealing with a body that is elected by all of the voters of Miami–Dade County ...." T. 550. Professor Briffault concurred: "If there is a problem with having non-UMSA people electing the UMSA representatives I don't see how you solve it until you have UMSA representatives elected solely by UMSA people." Briffault *Dep.* at 59–60.

Moreover, there are a host of practical problems with Plaintiffs' proposal that render even their desired result highly speculative and unsusceptible to judicial implementation and supervision. First, there are no judicially manageable criteria for deciding, in the first instance, what is an UMSA matter that would trigger the Commission's utilization of the proposed weighted voting rules. T. 557–558. Second, the weighting would only apply to a final Commission vote; therefore, the proposed remedy ignores the deliberative stages which are often the most important

part of the legislative process. T. 559–560. Third, the proposal fails to account for the formation of political coalitions, but rather is based upon the unrealistic assumption of complete geographic homogeneity of interest in UMSA voters. T. 561–562.[23] Fourth, the feasibility of the proposal is highly suspect given Plaintiffs' failure to account for the likely impact upon the voting rights of protected racial and ethnic minority groups in a county with documented patterns of racially polarized voting. T. 563; *see also Meek v. Metropolitan Dade County,* 908 F.2d 1540 (11th Cir.1990), *op. after remand,* 985 F.2d 1471 (11th Cir.1993).

In assessing the justiciability of Plaintiffs' remedial proposal it also is important to distinguish between "vote dilution" in a constitutional sense and the "dilutive consequences" of an overinclusive electorate. The former refers to a distinct type of voting rights claim. "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of the minority." *Thornburg v. Gingles,* 478 U.S. 30, 48, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *see also,* T. 541–545.[24] A vote dilution claim under the Fourteenth Amendment requires proof that the electoral

---

22. Dr. Engstrom made clear that he was not the author of the weighted voting proposal: "[I]t's not my proposed remedy." T. 249. Unlike the weighted voting proposal, the remedies proposed in Dr. Engstrom's expert report "addressed the overinclusive issue and the malapportionment" by "eliminating municipal voters from the election." T. 247–248. Plaintiffs were unable to rely on any of the remedies actually proposed by their expert because they all required the creation of a new municipal legislature for the UMSA, which Plaintiffs acknowledge is beyond the power of a court to grant.

23. As Dr. Lichtman correctly points out: "It is not necessarily possible to simply assume, if four out of 13 board members got together to control all decisions, that they would fairly and appropriately represent the UMSA residents of all 13 districts." T. 562.

24. In his testimony explaining the relationships between the concepts of overinclusiveness, malapportionment, and vote dilution, Dr. Lichtman correctly observed that while "in this case there is a linkage between the overinclusion claim and the malapportionment claim .... Vote dilution is a concept quite distinct and separate from the concept of overinclusion." T. 543.

structure which facilitates such vote dilution was adopted with a discriminatory purpose and has the discriminatory effect of depriving the minority group of the ability to elect their preferred candidates. *See Shaw v. Reno,* 509 U.S. 630, 639–40, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); *City of Mobile v. Bolden,* 446 U.S. 55, 66, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Plaintiffs neither pled nor attempted to prove a vote dilution claim at trial. T. 223–225, 545–547.

In contrast, the "dilutive consequences" which Plaintiffs claim their weighted voting proposal will remedy—simply refer to the consequential effects of the alleged overinclusion and malapportionment in terms of some unquantified reduction in the representation of the distinctive interests of UMSA residents on the County Commission. T. 253. This purported reduction in UMSA representation on the Commission has been rejected by the Supreme Court as an unrealistic theoretical assessment of voter ability to effect the outcome of an elected body's decisions. *See Presley v. Etowah County Commission,* 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992) (changes to the "internal operations of an elected body" that affect the allocation of power on the board do not bear a sufficiently "direct relation to voting and the election process" to come within the right to vote, as there is no judicially "workable standard for distinguishing between changes in rules governing voting and changes in the routine organization and functioning of government"). Therefore, there is no legitimate legal or factual basis to believe that the proposal would even indirectly ameliorate the claimed violation by "negat[ing]" the dilutive consequences of overinclusion and malapportionment." T. 250.

In any event, since it is undisputed that the proposed remedy fails to directly address and relate to any violation of a rec-

ognized voting rights claim under the Fourteenth Amendment, Plaintiffs have failed to satisfy their burden of establishing the justiciability of their claim.

## (2) Judicial Remedy May Not Alter Governmental Structure

■ The structure of local government and the allocation of governmental powers are beyond the reach of judicial remedial powers in a voting rights case. "The number, nature and duration of powers conferred upon these [municipal] corporations and the territory over which they shall be exercised rests in the absolute discretion of the state." *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907). Because they involve a substantial alteration in the structure or powers of state government, remedies such as changing the size of the governing body, *see Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); reallocating the powers on a local governing board, *see Presley v. Etowah County Commission,* 502 U.S. 491, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992); or altering the number, size and configuration of voting districts, *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), are not judicially available.

Plaintiffs' remedy is impermissible because it requires a substantial alteration in the nature of representation and a reallocation of the County Commission's political power over local affairs. Such alteration and reallocation are beyond the authority of a court to impose. *See Presley,* 502 U.S. at 503, 504–506, 112 S.Ct. 820 (A change in the distribution of power among elected officials, which "leaves undisturbed the composition of the electorate," does not have a sufficiently direct relation to, or impact on, voting to come with the scope of the right to vote); *Wymbs,* 719 F.2d at 1083, 1090 (remedy which weighted the

voting of a governing body impermissibly intruded upon state policy decisions concerning the nature of representation); *English v. Board of Educ. of Boonton,* 301 F.3d 69, 80 (3rd Cir.2002) (same). Indeed, Plaintiffs do not dispute that their remedy would alter significantly the manner in which the Commission currently functions. *See* Pls.' Proposed Findings at 40–44. Consequently, in the absence of a viable remedy offered by Plaintiffs, the Court concludes their claim is nonjusticiable. *See Burton v. City of Belle Glade,* 178 F.3d 1175, 1199 (11th Cir.1999) (plaintiffs only must show that the court "can fashion a permissible remedy in the particular context of the challenged system" to overcome concerns of nonjusticiability).

### B. Substantial Interest Analysis

The Court's determination that Plaintiffs' voting rights claim is not justiciable renders consideration of their specific legal theories unnecessary. Nevertheless, to ensure a complete record, the Court provides the following analysis of the merits of Plaintiffs' overinclusion and malapportionment claim.

██ The Court previously determined, and the parties agree, that *assuming* UMSA is a distinct geopolitical jurisdiction, the rational basis test is the appropriate standard of review.[25] *See* Order at 11–13. When applying "a rational basis standard of review, the courts necessarily have afforded broad discretion to the states, recognizing '[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective.'" Order at 12 (quoting *Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)).

In cases like this involving the question of whether a particular segment of a population is entitled to vote in an election, rationality is judged on the basis of whether the citizens sought to be excluded from the franchise have a "substantial interest" in the affairs of the jurisdiction. Accordingly, the question Plaintiffs have raised is whether city residents have a substantial interest in the first-tier, UMSA municipal government.

The proper standards to apply in this case are set forth in *Sutton v. Escambia County:*

> The party seeking to exclude city residents from voting in the county [Commission] elections has the burden of demonstrating that the application of the [Charter] is irrational or wholly irrelevant to the state's objective of electoral participation in the selection of county [commissioners].

809 F.2d 770, 772 (11th Cir.1987). *See also Spahos v. Mayor & Councilmen of Town of Savannah Beach,* 207 F.Supp. 688, 692 (S.D.Ga.1962), *aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269 (1962); *Creel v. Freeman,* 531 F.2d 286, 288 (5th Cir.1976);[26] *Glisson v. Mayor & Councilmen of Town of Savannah Beach,* 346 F.2d 135, 137 (5th Cir.1965). Thus, the burden is on Plaintiffs to show that the interests of city residents in the affairs and governance of the UMSA are so insubstantial or "wholly irrelevant" that their inclusion in the County's existing electoral scheme is "irrational."

The courts have looked to a number of factors to discern the existence of a substantial interest in non-resident voters, including: (1) the payment of taxes by nonresidents, *see Spahos,* 207 F.Supp. at 690,

---

**25.** *See supra* note 4.

**26.** Decisions of the United States Court of Appeals for the Fifth Circuit entered before

October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981).

*aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269; *May v. Town of Mountain Village,* 132 F.3d 576, 579 (10th Cir.1997); *Collins v. Town of Goshen,* 635 F.2d 954, 958 (2d Cir.1980); *Clark v. Town of Greenburgh,* 436 F.2d 770, 772 (2d Cir. 1971); *Glisson,* 346 F.2d at 136; (2) the provision of services to non-residents, *see Collins,* 635 F.2d at 958; *Clark,* 436 F.2d at 772; (3) property ownership among non-residents, *see Spahos,* 207 F.Supp. at 688, *aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269; *May,* 132 F.3d at 579; *Glisson,* 346 F.2d at 136; and, (4) the relationship between the geographical units involved. *See Board of County Com'rs of Shelby County v. Burson,* 121 F.3d 244, 249 (6th Cir.1997); *Duncan v. Coffee County,* 69 F.3d 88, 96 (6th Cir. 1995); *Sutton,* 809 F.2d at 774; *Phillips v. Andress,* 634 F.2d 947, 950 (5th Cir.1981); *Creel,* 531 F.2d at 288–89. These factors are by no means exclusive, however, and the Court must consider all factors that bear on the question of whether city residents have an interest in the County's first-tier provision of government. *See* Order Denying Motion for Reconsideration ("Reconsideration Order") at 4.

In analyzing these factors under the rational basis standard of review, courts necessarily have afforded broad discretion to the states, recognizing "[t]he constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *Glisson,* 346 F.2d at 137; *see also Spahos,* 207 F.Supp. at 692, *aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269; *May,* 132 F.3d at 580; *Collins,* 635 F.2d at 959; Order at 22–23. Additionally, "[i]n close cases, the decisions dictate that over-inclusiveness is less of a constitutional evil than underinclusiveness." *Sutton,* 809 F.2d at 775; *accord Duncan,* 69 F.3d at 98. It is important to emphasize that the interests of non-UMSA residents need not be the same or even similar to those of

UMSA residents to make it permissible for them to vote in UMSA elections. Non-residents may have a lesser interest, or a different interest, but they at least must have some interest to overcome any concerns of irrationality. *See Spahos,* 207 F.Supp. at 692, *aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269; *Collins,* 635 F.2d at 959; *Clark,* 436 F.2d at 772; *Glisson,* 346 F.2d at 137.

Based on its findings of fact *supra,* the Court concludes that Plaintiffs have failed to show that non-UMSA residents lack a sufficient interest in the affairs of the unincorporated area as to render the current system of UMSA governance irrational. First, the evidence presented at trial confirms that the County routinely provides at least some first-tier, municipal services to benefit residents of both the incorporated and unincorporated areas; the most significant of which is police protection. Additionally, the County Parks Department maintains local parks, funded by UMSA revenue, for the enjoyment of city and UMSA residents alike. Furthermore, the Public Works Department constructs and maintains local roads in the unincorporated area that are essential to city residents and the County owns and/or operates several buildings and facilities in the UMSA that supply services to city and UMSA residents alike. *See* Def.'s Exs. 9 & 9A.

Second, decisions concerning land use in the UMSA impact on the rest of the County. For example, the County Commission has the power to encourage or discourage urban infill in the municipal areas by regulating development in the unincorporated area. As a further example, the Northwest Wellfield, located in the unincorporated area, provides drinking water to both UMSA and city residents. *Comb. Stip.* ¶ 37; T. 56–58. Decisions affecting land use surrounding the well could impact city residents. T. 56–58.

Third, sales taxes, utility taxes, state revenue sharing, gas taxes, and other revenue sources provide the major source of revenue for municipal services provided by Defendant. These are paid by all County residents regardless of whether they reside in the UMSA or a city. T. 145–46. The County Commission has the authority to decide how to spend such funds and whether to use them for the unincorporated area exclusively or to spend them for countywide needs. Fla. Stat. § 218.64; T. 430–31.

Fourth, the County and the UMSA share not only revenue and services, but also the same governing body, administration, and employees.[27] The strength of the relationship between the UMSA and the County is, in and of itself, sufficient to allow city residents to participate in UMSA elections.

Fifth, it is worth recalling that the decision to consolidate control over the UMSA and countywide matters into a single metropolitan government was not imposed from without, but through a popular referendum. The Florida Supreme Court, in *Gray v. Golden*, 89 So.2d 785, 786–787 (Fla.1956), explained why it was rational for the County electorate, including both city and unincorporated area residents, to adopt a metropolitan form of government with authority over both countywide and unincorporated area matters. Among other things the Court noted:

- in many instances the boundaries of municipalities in Dade County have long since lost any reasonable relationship to the political and economic life of the majority of the people and that such boundaries are now a relic of the bygone era that preceded the industrial growth and development of the County;

- few, if any, municipalities in Dade County are composed of a cohesive, homogeneous population since practically all of them are interdependent in many ways;

- there are thousands of people in Dade County who live in one municipality, have employment, offices, positions or working places in another, shop or trade in another and whose children attend school in still another;

- the density of the population, common transportation and communication facilities, the mutual dependence on public utilities, the unified economy of the County, the common problems of drainage, transportation, communication, water supply, sewage, garbage collection and disposal, fire protection, zoning and planning for future development, demonstrate that municipal boundary lines are little more than artificial barriers that are outmoded by present needs and conditions.

*Id.* at 788.

As the Florida Supreme Court's opinion suggests, the Commission's powers over countywide and unincorporated area matters largely overlap. Moreover, the government's "municipal" powers are not lim-

---

**27.** In their efforts to distinguish the UMSA as an independent entity, Plaintiffs suggest that the County's "Team Metro" "provides administrators for UMSA [ ] paid from UMSA general fund revenues but not from countywide fund revenues." Pls.' Proposed Findings at 14. While Team Metro does service the UMSA, it is not exclusively dedicated to that area and thus does not comprise a separate, administrative body as Plaintiffs intimate. Rather, its functions include providing "internal and countywide customer service training," "information to citizens regarding enforcement of applicable County codes," and other countywide services. Pls.' Ex. 25 ("2001–2002 Proposed Operating Budget") at 221. Moreover, the 2002–2003 Proposed Budget includes funding for Team Metro from no less than six sources, including the UMSA and Countywide General Funds. *See* Pls.' Ex. 70 ("2002–2003 Proposed Operating Budget") at 258.

ited to the unincorporated area. Under the Miami–Dade County Charter, the Commission has authority to exercise municipal power even within incorporated municipalities. T. 295–96; Briffault, Expert Report at ¶ 11. For example, the government has power to: "[a]dopt and enforce uniform building and technical codes and regulations for both the incorporated and unincorporated areas of the county" (Charter § 1.01 A(13)); "[e]stablish and enforce regulations for the sale of alcoholic beverages in the unincorporated areas and approve municipal regulations on hours of sale of alcoholic beverages" (Charter § 1.01 A(16)); and, "[s]et reasonable minimum standards for *all* governmental units in the county for the performance of *any* service or function .... If a governmental unit fails to comply with such standards, and does not correct such failure after reasonable notice by the Board [of County Commissioners], then the Board may take over and perform, regulate, or grant franchises to operate any such service." (Charter § 1.01 A(18)) (emphasis added). Indeed, the Charter lays out procedures for the County Commission to "take over and operate, or grant franchises to operate *any municipal service.*" *Id.* (emphasis added); *see also* T. 295–297. The Charter also generally provides that "[a]ll of [the County's] powers may be exercised in the incorporated and unincorporated areas, subject to the procedures herein provided in certain cases relating to municipalities." (Charter § 1.01 B).

As the Supreme Court emphasized in *Avery*, it does not matter whether the County is currently exercising municipal powers in the incorporated areas: "[A] decision ... not to exercise a function within the [Commission's] power ... is just as much a decision affecting all citizens of the county as an affirmative decision." *Avery v. Midland County, Tex.,* 390 U.S. 474, 484, 88 S.Ct. 1114, 20 L.Ed.2d 45. What is plain is that the County Commission has authority to exercise both county and municipal powers in both incorporated and unincorporated areas further justifying the inclusion of all County residents in the franchise.[28]

Finally, this Court must respect the State of Florida's decision, as expressed by its citizens through its popularly-enacted constitution, to create just one governing body for the UMSA and the County. It is this decision that gives rise to the Plaintiffs' entire case. The State could have decided to create two separate governments, one for the UMSA and one for the County, but chose instead to create a single governing body for both. While reasonable people may differ as to the wisdom of the State's decision, as the Florida Supreme Court held in *Gray,* the decision to create a single governing body was certainly a rational one. 89 So.2d at 788.

In conclusion, Plaintiffs have not met their ultimate burden of showing that it is irrational to allow city residents to vote for UMSA officials who contemporaneously serve as representatives of the County as a whole. *See, e.g., Spahos,* 207 F.Supp. at 692, *aff'd per curiam,* 371 U.S. 206, 83 S.Ct. 304, 9 L.Ed.2d 269; *Sutton,* 809 F.2d at 772. *See also Creel,* 531 F.2d at 288; *Glisson,* 346 F.2d at 137.

---

**28.** To that end, during closing argument, Plaintiffs cited to footnote 8 of *Holt Civic Club v. City of Tuscaloosa* for the proposition that the assertion of extraterritorial powers by cities over unincorporated areas may not be constitutional in certain situations. 439 U.S. 60, 72 n. 8, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978). However, here the County is asserting its powers within its geographical confines in accordance with a grant of authority provided to it by the state Constitution. Fla. Const., art. VIII. Indeed, Plaintiffs have not alleged Defendant has acted beyond the scope of its powers as defined in the Florida Constitution or the Dade County Home Rule Charter in this respect.

## II. Equal Protection–Conditions on Incorporation Pursuant to the Charter Amendment

In addition to challenging the County's current allocation of the right to vote for the governing body of the unincorporated area, Plaintiffs also challenge the limitations imposed on future incorporations as secured by the October 3, 2000 Charter Amendment ("Amendment").[29] Plaintiffs contend that it is irrational to treat incorporation efforts differently *after* the Amendment than they were treated *before* the Amendment. Plaintiffs also contend that the conditions which the County is imposing on new municipalities are non-uniform and that the differences cannot be explained by any rational basis.

These claims, like Plaintiffs' voting rights claim, are governed by the rational basis test. *See, e.g., Harris v. McRae,* 448 U.S. 297, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). Applying that highly deferential standard, the Court concludes that Plaintiffs have not demonstrated that the Charter Amendment is irrational on its face or as applied. *See id.*

### A. Distinguishing Between Past and Future Incorporations

■ Plaintiffs contend the Charter Amendment is irrational because it treats new cities differently than cities created prior to the amendment. However, it is well established that applying a new law prospectively is not irrational. *See, e.g., Nordlinger v. Hahn,* 505 U.S. 1, 11–12, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *Haves v. City of Miami,* 52 F.3d 918 (11th Cir.1995) (upholding city's law banning houseboats within city that contained an exception for existing houseboats in a portion of city); *Montague v. Vinzant,* 643 F.2d 657 (9th Cir.1981) (legislature's decision to apply act prospectively is rational and consistent with common law presumption against the retroactive effect of new legislation or judicial ruling). In fact, laws are presumed to be prospective only. *See id. See also Crosby–Bey v. District of Columbia,* 700 F.Supp. 71 (D.D.C.1988) (state's decision to apply act prospectively only was rational and "in keeping with the well recognized rule of statutory construction that provides statutes affecting substantive rights and liabilities are presumed to have only prospective effect."). If a legislature could not draw a distinction between past action and future action, new or reform legislation could never be enacted. Accordingly, Plaintiffs' challenge on this basis is without merit.

### B. Case–by–Case Determinations

■ Although not a claim raised in their pleadings, at trial Plaintiffs also objected to the County's imposition of the mitigation fee and contract payment for services contending that they are *ad hoc* because they are negotiated individually with each new proposed municipality in the absence of any uniform standards.[30] Additionally,

---

**29.** To be clear, the Charter Amendment itself does not impose limitations on future incorporations. Rather, it serves to ensure that new cities will be bound by contractual conditions negotiated as a prerequisite to incorporation.

**30.** The Court notes for the record that the Plaintiffs' claim regarding the *ad hoc* application of the Charter Amendment is absent from the Amended Complaint. Although Plaintiffs refer to the Amendment in their "General Allegations" section, Plaintiffs' merely contend that it is part of a County policy of imposing onerous conditions on incorporations. *See* Am. Cmplt. at ¶¶ 31–33. As the Court explained in its order on summary judgment, the allegation was "not clearly part of Count I of the Amended Complaint nor [was] it discussed in the parties' pleadings on summary judgment." Order at 4 n. 10. Indeed, Plaintiffs' claims regarding the *ad hoc*

Plaintiff presented evidence suggesting that Defendant can be highly arbitrary in imposing these conditions on incorporation having on at least one occasion altered the terms after an agreement had been reached with the County Manager. T. 32–37, 270–82.

The County has explained that the affect of new incorporations on the UMSA revenue base and the continued provision of County services is a significant policy issue. T. 408–423. For example, the County, in having studied the issue repeatedly, believes that the incorporation of "donor communities" depletes the UMSA revenue base affecting the provision of services therein. T. 70–75, 408–423. Similarly, County officials are of the opinion that the compulsory use of Defendant's police, fire, library, and solid waste collection services is necessary to maintain the economies of scale sustaining their continued viability. T. 453–54. Plaintiffs did not refute these factual assumptions underlying Defendant's incorporation policy.[31]

In light of the County's concerns, in October of 2000, the Home Rule Charter was amended to ensure that new cities would be bound to the conditions negotiated as prerequisites to their incorporation. Then, on February 26, 2002, the Board adopted an ordinance, entitled "Future Municipalities' Obligations to the County," enumerating the minimum conditions that the Charter Amendment serves to secure.[32] *See* Def.'s Suppl. Ex. 13 at § 20–26. Specifically, "as a condition of incorporation approved pursuant to Article V of the Miami–Dade County Home Rule Charter, each new municipality shall include in its charter and shall agree:"

(a) . . . to remain a part of the Miami–Dade County Fire–Rescue District and the Miami–Dade County Library System in perpetuity.

(b) . . . in perpetuity to contract with the Miami–Dade County Police Department ("MPDP") and pay for specialized police services from its municipal millage or other municipal funds.

application of the Amendment have been somewhat organic evolving throughout the duration of this case. Nevertheless, in the interest of the justice, the Court will address Plaintiffs' concerns regarding the Amendment as most recently articulated at trial. *Cf.* notes 5 & 32.

In that vein, the undersigned also observes that during the course of this litigation Defendant apparently has endeavored to address at least some of the grievances asserted by Plaintiffs. Since the filing of this lawsuit, the County has consented to at least three new incorporations, *see supra* note 16 and ¶ 36, is considering several more, *see id.*, and has adopted ordinances specifying the conditions for incorporation. *See infra* at 1293–1294.

**31.** The Court notes that the County could raise the taxes imposed on UMSA residents to provide these services thereby avoiding, or possibly ameliorating, the need to require new municipalities to pay mitigation fees and

contract for their continued use. *See supra* at ¶¶ 15–16. Nevertheless, the County's decision to proceed in this manner is a political one and, therefore, not appropriately subject to this Court's review.

**32.** In the Joint Response, Plaintiffs newly argue that the "stipulated facts expressly establish that there was no comprehensive municipal incorporation plan at the time Miami Lakes was incorporated." *See* Joint Response at 4. While this is true, Plaintiffs have not shown how the Miami Lakes incorporation differs from subsequent incorporations governed by the ordinances. In fact, Plaintiffs concede that the Miami Lakes incorporation serves as a "model" for all future incorporations approved by the County. *See* Pls.' Proposed Findings at ¶ 56 (citing Trial Transcript at 415–16; Pls.' Ex. 44 at 1 & 46). Consequently, Plaintiffs have failed to identify, even in the absence of promulgated guidelines, a violation of their right to Equal Protection.

(c) ... to contract with the Miami–Dade County Police ("MPDP") and pay for local patrol police services for three years or such longer period of time as may be requested by the municipality.

*Id.* Additionally, § 20–26 further states:

(d) The fiscal impact of an incorporation on the remainder of the unincorporated area shall be revenue neutral; provided, however, any municipality which does not meet the foregoing requirement, as a condition of incorporation pursuant to Article V of the Miami–Dade County Home Rule Charter, shall agree to make an annual mitigation payment to the County's Municipal Services Trust Fund in the Unincorporated Municipal Service Area Budget, the amount of which shall be determined by the Board of County Commissioners, in the event of a negative fiscal impact of the municipality's incorporation on the unincorporated area. For purposes of this subsection, "a revenue neutral municipality" is defined as an area that previously, as part of the unincorporated municipal service area, generated revenues equal to or less than the cost of services provided to the area by the County.

*Id.*

Furthermore, on June 18, 2002, the Commission amended § 20–23, entitled "Board of County Commissioners consideration of proposed incorporation petition," which governs its evaluation of incorporation petitions. *See id.* at § 20–23. Provisions were added to ensure that the Board considers the fiscal impact of incorporation upon the unincorporated area:

(B) At the conclusion of the public hearing the Board of County Commissioners, in evaluating the appropriateness of a petitioner for incorporation, shall consider the following guidelines:

...

(6) The impact of the proposal on the revenue base of the unincorporated area, and on the ability of the County to efficiently and effectively provide services to adjacent remaining unincorporated areas, including the potential for the area to:

(a) Continue to participate in the County's Fire–Rescue and Library Districts, and

(b) Contract with the County for other municipal services,

...

(8) The financial impacts of the proposed incorporation on the remaining unincorporated areas of Miami–Dade County. Specifically in order to insure fiscal equity the per capita taxable property value of the area proposed for incorporation should fall between twenty-thousand dollars ($20,000.00) and forty-eight thousand dollars ($48,000.00) in order to assure that fiscal viability is maintained in both the potential new municipality and the remaining unincorporated area.

...

(10) Any other factor that arises by virtue of any special or unique circumstances of a given area.

*Id.*

Notwithstanding the above, Plaintiffs allege Defendant imposes *ad hoc* conditions upon each new incorporating municipality. The Court is sympathetic to the efforts of Plaintiffs and other citizens seeking to establish new cities within the County, noting for the record their exhaustive undertakings. For example, the incorporation of West Dade took over eight years during which Defendant altered its policy on incorporation no less than six times. T. 272–82. At one point, the County Commission rejected the incorporation agreement reached by the citizen's group and the

County Manager seeking more money under Defendant's policy of revenue neutrality. T. 280–82.

Indeed, based on the County's guidelines for incorporation, as codified in the above cited ordinances, each new municipality may be required to pay a different mitigation fee, depending on per capita tax base, and contract fee for services, depending on use.[33] *See* Def.'s Suppl. Ex. 13 at §§ 20–23 & 20–26. However, regardless of the payment differentiation, *all* of the new municipalities are subject to the *same* considerations and conditions detailed above.[34] *See id.* Consequently, while the quantum, or even the precise means of arriving at the quantum, of the mitigation fee and services payment may vary on a case-by-case basis, they are not *ad hoc* or highly arbitrary as Plaintiffs contend since the ultimate objective, as now stated in the Miami–Dade County Code, is revenue neutrality.[35] *See* Def.'s Suppl. Ex. 13. Moreover, Plaintiffs did not demonstrate— assuming Defendant is employing more than one method to calculate the fee—that

---

**33.** It appears from the record that the purpose of the contract fee is to secure payment for the *actual* cost of services rendered by the County in a new municipality. By example, Defendant explains that:

In fiscal year 2001–2002, the cost of specialized police services for Miami Lakes was estimated as $590,000. The residents of Miami Lakes were already paying through their countywide property taxes $377,000 (computed as 0.23 mills X $1,636,850 (the net property tax roll for Miami Lakes)). The balance of the cost ($213,000) for specialized police services is paid directly by the city to the County pursuant to the contract.

Joint Response at 16. The County continues to explain that: "Because such residents [of the newly incorporated areas] also pay countywide taxes, they receive a credit for such taxes against the amount charged in the contract for such services." *See id.* at 17.

Similarly, residents of the UMSA pay the actual cost of specialized police services minus a credit for payment of their countywide taxes. *See id.* at 14–15. Consequently, as Defendant elucidates: "The new policy is intended to preserve the status quo by requiring new cities to pay the same amount they paid before they were incorporated and to minimize the impact of new incorporations on the areas they left behind." *See id.* Thus, rather than only pay the 0.23 mills of countywide taxes required of older cities, thereby depleting the total revenue base available for such services, new municipalities must pay the estimated, actual cost of such services akin to residents of the UMSA. The imposition of such a policy is not irrational viewed under the standard governing this Court's inquiry.

**34.** At closing argument, and in the Joint Response, Plaintiffs suggested § 1.01(18) of the Home Rule Charter requires uniform treatment of municipalities within the County. However, a review of this provision suggests that it merely seeks to ensure that Defendant "[s]et reasonable minimum standards for all governmental units in the county for the performance of any service or function," requiring that the "standards shall not be discriminatory as between similar areas." Home Rule Charter § 1.01(18). Consequently, it in no way addresses treatment of non-governmental units, namely those areas seeking to incorporate.

**35.** Perhaps more to the point, in a county of this size and diversity, the incorporation of each area will impact the remainder of the County in various ways to varying degrees. No doubt, some areas are wealthy, some poor, some largely industrial, some largely residential, some crime-ridden, some with little crime at all. *See Lyes v. City of Riviera Beach,* 166 F.3d, 1332, 1342 (11th Cir.1999) ("[E]qual treatment consists not only of treating like things alike, but also of treating unlike things differently according to their differences."). Thus, it is not wholly irrational for the County, when establishing political subdivisions, to reserve to itself the ability to tailor conditions to a particular area, treating each incorporating community differently, subject only to the confines of the Florida Constitution. *See Hunter,* 207 U.S. at 178, 28 S.Ct. 40 (in establishing and regulating its political subdivisions "the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States").

the methods are irrational or producing irrational disparities.

Again, this Court is not charged with supervising County government. Rather, the relevant inquiry is whether the imposition of the conditions is rationally based. *See* Order at 12 (quoting *Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671 (1980)). In this respect, the undersigned is constrained to defer to the County. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 178, 28 S.Ct. 40, 52 L.Ed. 151 (1907); *Lawyer v. Department of Justice*, 521 U.S. 567, 574–76, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997).

Accordingly, in light of the above, the Court finds that the Charter Amendment is not unconstitutional on its face, *see supra* at § II.A, or as applied to secure and implement the conditions imposed by the County upon new municipalities. *See supra* at § II.B. The Court concludes it was enacted for the rational purpose of facilitating the County's interest in limiting the fiscal impact of future incorporations on the portions of the unincorporated area left behind.

### III. State Budgeting Requirements–Violation of Fla. Stat. § 129.01

■ Finally, Plaintiffs contend Defendant is in violation of Fla. Stat. § 129.01. The Court already has concluded that § 129.01 requires Defendant to effectuate "a division of county revenue derived from or on behalf of ... [an] unincorporated area." Order at 28–30. The only question remaining for trial was whether Defendant properly effectuated such a division within its budget. *See id.*

The County passes two separate budget ordinances, one for the UMSA and the other for the County. *See* Pls.' Exs. 23–27. The County budget clearly delineates between UMSA and countywide revenues. *See id.* Additionally, the County Budget Director and an independent auditor have both verified the County's compliance with the statute. T. 317; Dep. of Jose Rodriguez, at Ex. I. Plaintiffs' argument to the contrary appears to be based on their assumption that the accounting system, rather than the budgeting system, should reflect a similar division. However, this is not required by the statute. Fla. Stat. § 129.01.

Moreover, instead of trying to show that the County budget does not accurately "effectuate a division of county *revenues* derived from or on behalf of ... [an] unincorporated area," Fla. Stat. § 129.01, at trial Plaintiffs tried to show that the County's *expenditures* of unincorporated revenue were not delineated properly. T. 41. However, pursuant to the statute, the County's budget need only reflect an "*approximate* division of expenditures." Fla. Stat. § 129.01 (emphasis added). Plaintiffs have not shown the County fails to comply in this regard.

### CONCLUSION

Upon the foregoing facts and conclusions, it is hereby ORDERED AND ADJUDGED that:

1. Plaintiffs' Equal Protection voting rights claim is DISMISSED WITH PREJUDICE. Plaintiffs failed to meet their burden of proving their voting rights claim is justiciable and that Defendant's electoral scheme is irrational.

2. Plaintiffs' Equal Protection challenge to the October 3, 2000 Charter Amendment is DISMISSED WITH PREJUDICE. Plaintiffs failed to meet their burden of showing that the Amendment is irrational on its face or as applied.

3. Plaintiffs' claim for violation of Fla. Stat. § 129.01 is DISMISSED WITH PREJUDICE. Plaintiffs failed to meet their burden of showing that Defendant's budget does not evidence a division be-

tween countywide and UMSA revenues and an approximate division between expenditures. It is further

ORDERED AND ADJUDGED that FINAL JUDGMENT is hereby entered in favor of Defendant and against Plaintiffs on the Amended Complaint herein. It is further

ORDERED AND ADJUDGED that the imposition of attorney's fees is inappropriate in this instance. *See, e.g., Dowdell v. City of Apopka, Florida,* 698 F.2d 1181 (11th Cir.1983). Plaintiffs brought this action in a legitimate effort to challenge acts of their local government. While the Court has found against them, there is no evidence of bad faith or frivolousness. Consequently, the Court will not award fees or costs to either party.